IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Elliott Associates, L.P.; Elliott International, L.P.; The Liverpool Limited Partnership; Glenhill Capital LP; Glenhill Capital Overseas Master Fund LP; Glenhill Concentrated Fund LP; Glenview Capital Partners, L.P.; Glenview Institutional Partners, L.P.; Glenview Capital Master Fund, Ltd.; GCM Little Arbor Partners, L.P.; GCM Little Arbor Institutional Partners, L.P.; GCM Little Arbor Master Fund, Ltd.; GCM Opportunity Fund, L.P.; Glenview Capital Opportunity Fund, L.P.; Glenview Offshore Opportunity Master Fund, Ltd.; Perry Partners L.P.; and Perry Partners International, Inc., | : : : : : : : : : : : : : : : | **ECF CASE**<br><br>CaseNo.<br>10 CIV 0532 (HB)(THK) |
| Plaintiffs, | : : | (Jury Demanded) |
| -versus- | : : | **COMPLAINT** |
| Porsche Automobil Holding SE, f/k/a Dr. Ing. h.c. F. Porsche AG; Wendelin Wiedeking; and Holger P. Haerter, | : : : | |
| Defendants. | : : : | |

Plaintiffs, by their attorneys, allege the following based on Plaintiffs' personal knowledge and their counsel's investigation. Counsel's investigation included review of press releases by Volkswagen AG ("VW") and Defendant Porsche Automobil Holding SE, f/k/a Dr. Ing. h.c. F. Porsche AG ("Porsche," and along with Porsche's former Chief Executive Officer Wendelin Wiedeking ("Wiedeking") and former Vice President of Finance Holger P. Haerter ("Haerter"), the "Defendants"), public statements by Defendants, security analysts' reports concerning Porsche and VW, Porsche's and VW's financial disclosures, and news reports about Porsche and VW. A reasonable opportunity for discovery likely will reveal substantial additional evidentiary support for the allegations set forth below.

## NATURE OF THE ACTION

1.      Plaintiffs were victims of what the financial press has called "a massive short squeeze" (Reuters) and "a short squeeze of historic proportions" (*New York Times*).[1]

2.      In late 2008, Plaintiffs had short positions in VW stock.  This meant that Plaintiffs had borrowed VW shares and sold them, undertaking an obligation to repurchase the shares and return them at a future date.  Unknown to Plaintiffs, however, Porsche, at the direction of Wiedeking and Haerter, had cornered nearly all of the freely traded voting shares of VW (the "VW shares").  Plaintiffs did not know that they were effectively borrowing shares controlled by Porsche (including through options-contract counterparties), and that Porsche and these counterparties had launched a secret plan to take over VW.  On October 26, 2008, Porsche revealed its true holdings of VW shares (including the shares it controlled through counterparties) along with its previously secret plan to take over VW.  The consequence was a short squeeze in which the price of VW shares shot upwards.  Porsche made massive profits, while Plaintiffs lost tremendous amounts of money covering short positions at artificially high prices.

3.      Porsche cornered the market in VW shares by breaking the law.  Specifically, Porsche cornered the market in VW shares (1) with false denials of its intent to take over VW and (2) by engaging in a series of manipulative derivatives trades to hide the extent to which Porsche controlled VW shares.

---

[1] In a short squeeze, "the price of a stock is inflated to levels at which the short seller can no longer accept the costs associated with maintaining the short position, or at which the risk of loss is increased beyond acceptable levels, forcing the short seller to 'cover' his position.  This has the dual effect of removing the short seller from the company's market and further increasing demand for the company's stock, as the short seller must purchase the inflated shares from the limited amount available in the public market."  *Rocker Mgmt. L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 U.S. Dist. LEXIS 16854, *6 (D.N.J. June 7, 2005).

4.      The story of Porsche's fraud and manipulation begins in early 2008.  On February 25, 2008, Porsche representatives held a secret meeting in Berlin with a high-ranking officer of the German State of Lower Saxony participating on behalf of Prime Minister Christian Wulff. (Lower Saxony owned slightly more than 20% of VW's shares at all relevant times.)  At the meeting, according to German press accounts that surfaced more than a year later, Porsche disclosed its intention to implement a "domination agreement" with VW.   A domination agreement between an acquiring firm and a target firm allows the acquiring firm to control the target firm's decisions.[2]  Typically a bidder can put a domination agreement into place after acquiring 75% of the voting shares of the target company.  But VW's articles and a German law known as the "VW Law" required approval by holders of 80% of VW's shares, 5% more than the typical threshold.  Nevertheless, Porsche sought to obtain ownership of 75% of VW's shares as a first step toward domination.  With 75% ownership, Porsche could achieve domination if (1) it was able to strike a deal for domination with Lower Saxony, or (2) the European Court of Justice abolished the restrictions raising the requirements at VW for a domination agreement from 75% to 80%, as Porsche expected eventually would occur.  Porsche set out to secretly build its stake toward 75%.

5.      Defendants wanted to keep their plan secret while they acquired control over nearly 75% of VW's shares—in order to prevent the price from rising to reflect Porsche's true intention to take over—and worked to maximize their chances of obtaining domination. Defendants hid Porsche's takeover in two ways.

6.      The first way that Defendants hid Porsche's takeover was by lying.  From March 2008 until just days before it revealed the truth, Porsche consistently denied that it was seeking

---

[2] *See* Thomas Stohlmeir, *German Public Takeover Law: Bilingual Edition with an Introduction to the Law* 119–120 (2002).

to take over VW and suggested that it would not raise its stake above a simple majority. These statements were false, since Porsche had decided and begun taking steps to take over VW at least as early as February 2008, and as early as mid-2008 had achieved control of nearly 75% through outright positions and options. Porsche's head of investor relations later admitted that Porsche had intentionally kept its true strategy secret: "We are a very small company buying into a very big company. That is not something you can afford if everybody is able to read your strategy in the newspaper."

7. VW also knew that Porsche was lying about its intentions. In an interview published on May 12, 2009, VW chairman and Porsche shareholder Ferdinand Piech conceded that Porsche had decided to increase its stake in VW up to 75% as early as mid-year 2008. Whether that is the first time Piech and VW learned of the plan remains to be determined in discovery, but Piech's admission demonstrates that Porsche lied, for example, on September 18, 2008, when it told an online magazine that a domination agreement with VW was "totally unrealistic." If Piech and VW understood the extent of Porsche's control at the time of that statement, then Piech and VW also knew that Porsche was lying.

8. The second way that Defendants hid Porsche's takeover was by manipulating the market in VW shares. Porsche concealed its plan by acquiring much of its position in VW shares through options contracts it entered into in 2007 and 2008, contracts which allowed Porsche to ambush the market once it had amassed control over enough shares. Two features of Porsche's options trades made them manipulative.

9. The first feature that made Porsche's options trades manipulative was that Porsche disguised physical options contracts—contracts that it should have disclosed—as cash settled options contracts that did not have the same disclosure requirements. That Porsche did

not really consider its options contracts to be cash settled is clear from what Porsche said when it revealed the truth to the market on October 26, 2008. Porsche admitted that day that its options actually reflected part of its "74.1%" control and, lest anyone doubt Porsche's control over the shares represented by the option contracts, minimized the cash settled nature of the contracts by calling them the "so called" cash settled options. Since Porsche had the ability and intention to convert these options into actual share ownership, it should have disclosed its position under applicable law, but it did not do so.

10.     The second feature that made Porsche's options trades manipulative was that Porsche methodically parceled out its option contracts to evade counterparty disclosure requirements. Porsche knew that the counterparties to its options contracts would purchase VW shares to hedge the options. But if any one of Porsche's counterparties acquired too high a percentage of VW's shares as hedges, that counterparty would have its own legal obligation to disclose its ownership of those hedging shares, threatening to expose Porsche's accumulation of control over VW shares. A counterparty's disclosure would alert the market that someone had entered into large derivatives positions with that counterparty. The market then would be able to infer that a takeover of VW might be in progress, as it would be clear that someone was acquiring control of VW's shares using options contracts purchased from the disclosing counterparty. To make sure the truth remained hidden, Porsche had to divide up its options contracts among numerous counterparties. A court in this District recently recognized the deceptive nature of such intentional efforts to parcel out trades to evade the need for a counterparty to disclose shares it held as hedges. *See CSX Corp. v. The Children's Investment Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511 (S.D.N.Y. 2008), *aff'd*, 292 Fed. Appx. 133 (2d Cir. 2008). Porsche did the same thing here.

11.     Porsche's intentional misrepresentations and manipulative acts induced the Plaintiffs to sell short the VW shares. Plaintiffs relied on Porsche's various public statements with regard to its ownership of VW shares, and Plaintiffs relied on the absence of any disclosed accumulation of Porsche shares. Given the facts available to them, Plaintiffs determined the price of VW shares was too high and decided to short VW shares. By short selling, the Plaintiffs hoped to profit when the price of VW shares returned to levels that reflected the fundamentals of its business.

12.     Defendants' fraud and manipulative acts had an effect on the price at which Plaintiffs entered into short sales of VW shares. By hiding the true extent of Porsche's control over VW shares up until the October 26 announcement, Defendants led Plaintiffs and other investors to believe, incorrectly, that the natural interplay of supply and demand determined the then-current prices of VW shares. In fact, both the supply of and demand for VW shares were skewed by Defendants' fraud and manipulative acts. Demand was in truth greater than it appeared, because Defendants wrongfully concealed the efforts of Porsche and its options-contract counterparties to buy up VW shares. At the same time, the supply of shares was less than market prices indicated, because Defendants' fraud and manipulation hid the extent to which Porsche had cornered the market in the free float of VW shares. By thus hiding the extent to which Porsche had cornered the market in VW shares, Defendants caused Plaintiffs to take short positions prior to October 26 at prices that did not reflect information the market should have had. Defendants' fraud and manipulation had the effect of keeping the price of VW shares artificially low.

13.     Had the market been aware that Porsche intended to take over VW and that Porsche had accumulated a much larger position in VW shares than it was letting on, the price of

VW shares would have been much higher, the risk in shorting VW shares would have been fully apparent, and Plaintiffs would not have shorted VW shares at the prices prevailing in the market at that time.

14.     On October 26, 2008, Porsche set the short squeeze in motion.  Porsche said it had become "apparent that there were considerably more short positions in the market than expected."  At the time of Porsche's announcement of the true extent of its control of VW shares and its true intentions with respect to VW, the short interest in VW was about 13%.[3]  But Porsche knew it had acquired control of 74.1% of VW's shares.  Porsche also knew that Lower Saxony held 20% of VW's shares.  Therefore, Porsche knew that the free float of VW shares was only about 6% compared with a short interest of 13%.

15.     When Porsche revealed its true control, it said that "[a]t the end of last week, Porsche SE held 42.6 percent of the Volkswagen ordinary shares and in addition 31.5 percent in so called cash settled options relating to Volkswagen ordinary shares to hedge against price risks, representing a total of 74.1%."  Never before had Porsche disclosed the extent of its options, or admitted that the options should be added to the shares it owned outright to calculate its "total [stake]."  Porsche's representation of a "total" of "74.1%" confirms that Porsche viewed its options and its understandings with its counterparties as giving it control of the VW shares underlying the options.  Porsche also admitted it aimed "to increase to 75% in 2009, paving the way to a domination agreement," putting the lie to its statement just weeks earlier that domination was "totally unrealistic."

16.     As the *Wall Street Journal* put it, "all hell broke loose" following Porsche's announcement:

_____

[3] The "short interest" in a stock is the percentage of that stock that has been sold short.

Funds that had borrowed VW shares and sold them, expecting no takeover offer and betting the stock would decline, raced to purchase shares to unwind the bets. There weren't enough to go around. Part of the reason is that underwriters of cash-settled options typically hedge their risk by owning the shares of the company involved. The shares they owned, combined with those Porsche had acquired, added up to 74.1%, and Lower Saxony state owned 20.1%. The result was that while some 12.8% of VW shares were on loan, mostly to short sellers, those that for practical purposes were in circulation amounted to only 6% of VW shares. As hedge funds fought for the remaining VW shares, they drove the stock's price ever higher—deepening their losses. At the height of the short squeeze on Oct. 28, VW stock briefly topped 1,000 Euros, nearly five times as high as on Oct. 24, making VW the biggest company by stock-market value for a few hours.

Mike Esterl and Edward Taylor, "As Giant Rivals Stall, Porsche Engineers a Financial Windfall," *Wall Street Journal*, A1, November 8, 2008.

17.     Plaintiffs were forced to cover their short positions at prices that spiraled higher and higher. Porsche was no mere bystander while this happened. Porsche released billions of Euros worth of shares into the short squeeze for its own profit. By releasing some of its own positions, Porsche was able to skim off outrageous short squeeze profits while still maintaining the bulk of its position for the takeover of VW.

18.     As Plaintiffs weathered the short squeeze in the last days of October and into November 2008, a Porsche representative mocked them, saying, "A couple of gamblers on the market got their odds wrong. And now they are pointing a finger at us." But Defendants stacked the deck and loaded the dice. No Plaintiff would have sold VW shares short had it known that Defendants intended to take over VW and that Porsche already had amassed a huge position in options, options that Porsche considered equivalent to shares it owned outright.

## PARTIES

**Plaintiffs**

19.     Elliott Associates, L.P. is a Delaware limited partnership with its principal address at 712 Fifth Avenue, 36th Floor, New York, New York 10019.  Elliott Management Corporation in New York, New York, at all relevant times, provided services to Elliott Associates, L.P., and personnel at Elliott Management Corporation had authority over its VW-related investment decisions.

20.     Elliott International, L.P. is a Cayman Islands limited partnership with its registered address at c/o Maples & Calder, P.O. Box 309, Ugland House, South Church Street, George Town, Cayman Islands.  Elliott Management Corporation in New York, New York, at all relevant times, provided services to Elliott International Capital Advisers, Inc., the investment manager of Elliott International, L.P., and personnel at Elliott Management Corporation had authority over its VW-related investment decisions.

21.     The Liverpool Limited Partnership is a Bermuda limited partnership with its registered address at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda.  Elliott Management Corporation in New York, New York, at all relevant times, provided services to The Liverpool Limited Partnership, and personnel at Elliott Management Corporation had authority over its VW-related investment decisions.

22.     Glenhill Capital LP is a Delaware limited partnership with its principal address at 156 West 56th Street, 17th Floor, New York, New York 10019.  Glenhill Capital Management LLC in New York, New York, at all relevant times, managed Glenhill Capital LP, and made its VW-related investment decisions.

9

23.     Glenhill Capital Overseas Master Fund LP is a Cayman Islands limited partnership with its principal address at Goldman Sachs (Cayman) Trust Limited, P.O. Box 896 KY1-1103, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands. Glenhill Capital Management LLC in New York, New York, at all relevant times, managed Glenhill Capital Overseas Master Fund LP, and made its VW-related investment decisions.

24.     Glenhill Concentrated Fund L.P. is a Delaware limited partnership with its principal address at 156 West 56th Street, 17th Floor, New York, New York 10019. Glenhill Capital Management LLC in New York, New York, at all relevant times, managed Glenhill Concentrated Fund, L.P., and made its VW-related investment decisions.

25.     Glenview Capital Partners, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153. Glenview Capital Management, LLC in New York, New York, at all relevant times, managed Glenview Capital Partners, L.P., and made its VW-related investment decisions.

26.     Glenview Institutional Partners, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153. Glenview Capital Management, LLC in New York, New York, at all relevant times, managed Glenview Institutional Partners, L.P., and made its VW-related investment decisions.

27.     Glenview Capital Master Fund, Ltd. is a Cayman Islands company with its principal address at Goldman Sachs (Cayman) Trust Limited, P.O. Box 896 KY1-1103, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands. Glenview Capital Management, LLC in New York, New York, at all relevant times, managed Glenview Capital Master Fund, Ltd., and made its VW-related investment decisions.

28.   GCM Little Arbor Partners, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153.  Glenview Capital Management, LLC in New York, New York, at all relevant times, managed GCM Little Arbor Partners, L.P., and made its VW-related investment decisions.

29.   GCM Little Arbor Institutional Partners, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153. Glenview Capital Management, LLC in New York, New York, at all relevant times, managed GCM Little Arbor Institutional Partners, L.P., and made its VW-related investment decisions.

30.   GCM Little Arbor Master Fund, Ltd. is a Cayman Islands company with its principal address at Goldman Sachs (Cayman) Trust Limited, Goldman Sachs (Cayman) Trust Limited, P.O. Box 896 KY1-1103, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands.  Glenview Capital Management, LLC in New York, New York, at all relevant times, managed GCM Little Arbor Master Fund, Ltd., and made its VW-related investment decisions.

31.   GCM Opportunity Fund, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153. Glenview Capital Management, LLC in New York, New York, at all relevant times, managed GCM Opportunity Fund, L.P., and made its VW-related investment decisions.

32.   Glenview Capital Opportunity Fund, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153.  Glenview Capital Management, LLC in New York, New York, at all relevant times, managed Glenview Capital Opportunity Fund, L.P., and made its VW-related investment decisions.

33.     Glenview Offshore Opportunity Master Fund, Ltd. is a Cayman Islands company with its principal address at Goldman Sachs (Cayman) Trust Limited, Goldman Sachs (Cayman) Trust Limited, P.O. Box 896 KY1-1103, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands.  Glenview Capital Management, LLC in New York, New York, at all relevant times, managed Glenview Offshore Opportunity Master Fund, Ltd., and made its VW-related investment decisions.

34.     Perry Partners L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, New York, New York 10153.  Perry Corp. in New York, New York, at all relevant times, managed Perry Partners L.P., and made its VW-related investment decisions.

35.     Perry Partners International, Inc. is a British Virgin Islands corporation with its principal address at Citco Fund Services (Cayman Islands) Limited, Windward 1, Regatta Office Park, West Bay Road, P.O. Box 31106, Grand Cayman KY1-1205, Cayman Islands.  Perry Corp. in New York, New York, at all relevant times, managed Perry Partners International, Inc., and made its VW-related investment decisions.

**Defendants**

36.     Until November 13, 2007, Porsche Automobil Holding SE was known as Dr. Ing. h.c. F. Porsche Aktiengesellschaft.   On November 13, 2007, Dr. Ing. h.c. F. Porsche Aktiengesellschaft became a European stock corporation (Societas Europaea) and was renamed Porsche Automobil Holding SE.

37.     Wiedeking was, at all relevant times, President and Chief Executive Officer of Porsche.

38.     Haerter was, at all relevant times, Vice President of Finance for Porsche.

39.     The gains to Porsche from its scheme flowed directly into the pockets of Defendants Wiedeking and Haerter, whose outsized compensations depended on Porsche's profitability.  Porsche reportedly paid Wiedeking an estimated $113 million in 2008.  Porsche reportedly paid Haerter an estimated $44 million in 2008.

## SUBJECT-MATTER AND PERSONAL JURISDICTION

40.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and under §27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa, because certain of Plaintiffs' claims arise under §10(b) and §20(a) of the Exchange Act.

41.     This Court has supplemental jurisdiction over Plaintiffs' state-law fraud claims pursuant to 28 U.S.C. §1367.

42.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(2), as well as under §27 of the Exchange Act, 15 U.S.C. §78aa, each of which extends personal jurisdiction to the limit of the Fifth Amendment's Due Process Clause.

43.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, interstate wire and telephone communications.

44.     As more fully described in this Complaint, Defendants' acts and conduct occurred in the United States, were directed at investors and investment managers in the United States, and had substantial, direct and foreseeable effects on Plaintiffs and other persons in the United States.

45.     Upon information and belief, Porsche began its efforts to acquire VW by purchasing a large block of VW shares from Brandes Investment Partners LLC, an American institutional investor in San Diego, California.

46.     It was Porsche's practice to distribute press releases, announcements, and other significant company news or documents by email to an undisclosed distribution list. Names of the distribution list's recipients appeared, however, in an email on June 26, 2007. That email revealed at least 30 recipients in the United States. The U.S. recipients were individuals at hedge funds, investment funds, and pension funds.

47.     Upon information and belief, Porsche used a substantially similar distribution list whenever it emailed press releases, announcements, and other significant company information.

48.     The following are examples of emails Porsche is believed to have sent into the United States:

a.   On November 14, 2006, Sylvia Stadelmann ("Stadelmann") of Porsche emailed an invitation to Porsche's analyst conference in Stuttgart.

b.   On March 5, 2007, Stadelmann emailed the Porsche Group Shareholders' Letter, which discussed Porsche's investment in VW.

c.   On March 24, 2007, Frank Gaube ("Gaube"), head of Porsche investor relations, emailed an announcement of the decision by the Supervisory Board of Porsche to authorize an increase in Porsche's stake in VW from 27.3% to up to 31% and disclosed that Porsche held an option to purchase up to 3.7% of VW's shares.

d.  On April 30, 2007, Gaube emailed a notice that Porsche had just published a mandatory offer for VW shares on its website and a link directing recipients of the email to Porsche's offer.

e.  On May 4, 2007, Gaube emailed an invitation to Porsche's extraordinary general meeting.

f.  On May 7, 2007, Gaube emailed a notice that Porsche had just published the results of the first week of Porsche's mandatory offer for VW shares.

g.  On May 30, 2007, Gaube emailed a notice of the expiration of Porsche's mandatory offer for VW shares.

h.  On June 4, 2007, Gaube emailed a press release announcing the results of Porsche's mandatory offer for VW shares.

i.  On June 26, 2007, Gaube emailed a press release discussing Porsche's investment in VW.

j.  On October 23, 2007, Stadelmann emailed a Porsche press release discussing a decision by the European Court of Justice regarding the VW Law.

k.  On December 14, 2007, Gaube emailed Porsche's interim financial information, which contained a discussion of Porsche's "strategic/industrial" partnership with VW.

l.  On March 3, 2008, Katharina Dippell ("Dippell") of Porsche emailed a press release announcing the decision of the Supervisory Board of Porsche to authorize the increase of Porsche's stake in VW to more than 50%.

m.  On March 10, 2008, Dippell emailed a press release in which Porsche stated that it would not seek to raise its stake in VW to 75%.

15

n.   On March 14, 2008, Dippell emailed a press release in which Porsche said it would seek to amend VW's articles of association to reflect the judgment of the European Court of Justice regarding the VW Law.

o.   On March 19, 2008, Dippell emailed Porsche's half-year financial report, which discussed Porsche's investment in VW, the VW Law, and Porsche's intentions going forward, stating that once "antitrust clearance has been given, Porsche SE will acquire the majority shareholding in Volkswagen, with a view to creating one of the world's most innovative and efficient automotive alliances...."

p.   On April 18, 2008, Dippell emailed a transcript of a magazine interview of Wolfgang Porsche and Ferdinand Piëch, members of the two families that control much of Porsche and VW, in which they discussed Porsche's investment in VW.

q.   On June 18, 2008, Stadelmann emailed Porsche's interim financial information, which discussed Porsche's investment in VW, the VW Law, Porsche's intention to acquire the "majority of voting rights" in VW, and Porsche's intent to create "one of the world's most innovative and efficient automotive alliances...."

r.   On October 27, 2008, Gaube emailed the October 26, 2008 press release in which Porsche finally revealed its intention to go to 75% of VW shares and to seek a domination agreement with VW, which helped lead to the short squeeze in VW shares.

49.     Porsche also distributed information regarding Porsche's investment in VW by participating in telephone conversations with investors in the United States:

a.  On May 5, 2008, Gaube spoke by telephone to Keith Goodman, an analyst at Glenhill in New York.  Upon information and belief, Gaube knew Goodman was in New York.  Goodman was an analyst responsible for helping Plaintiffs Glenhill Capital LP, Glenhill Capital Overseas Master Fund LP, and Glenhill Concentrated Fund LP decide what positions to take in the market.  During the telephone call, Gaube told Goodman that Porsche wanted to get to more than 50% ownership in Porsche and, toward that goal, had used options to lock up 20% of VW shares, in addition to the approximately 31% it already owned outright.   Gaube also told Goodman that Porsche had no intention of increasing its stake in VW to 75%.

b.  On October 22, 2008, Gaube spoke by telephone with Glenview's CEO, Larry Robbins, who was in New York.  Upon information and belief, Gaube knew that Robbins was in New York.  Robbins had final authority to make all trading decisions for Plaintiffs Glenview Capital Partners, L.P., Glenview Institutional Partners, L.P., Glenview Capital Master Fund, Ltd., GCM Little Arbor Partners, L.P., GCM Little Arbor Institutional Partners, L.P., GCM Little Arbor Master Fund, Ltd., GCM Opportunity Fund, L.P., Glenview Capital Opportunity Fund, L.P., and Glenview Offshore Opportunity Master Fund, Ltd.  During the telephone call, Gaube told Robbins that Porsche did not intend to go much above 51% ownership in VW and did not intend to go to 75%.

50.     Defendants made other statements related to their VW investment while they were in the United States:

   a.   On October 12, 2005, Defendant Haerter spoke on Porsche's behalf at the St. Regis Hotel in New York with American investors about Porsche's investment in VW.  Merrill Lynch's New York office sponsored this meeting between Porsche and American investors.  Porsche's American meeting was part of a road show about which the *Financial Times* reported on October 2, 2005: "Conscious of the market's scepticism, Porsche will from this week meet UK and US investors to try to convince them of the merits of its plan."

   b.   On January 9, 2007, at the North American International Auto Show in Detroit, Defendant Wiedeking met with reporters in a conference room inside Detroit's Cobo Center.  Of the 69 questions posed to Wiedeking during an hour-long group interview, 64 pertained to VW.

   c.   On January 10, 2007, *Business Week* reported an interview between its Detroit correspondent David Kiley and Defendant Wiedeking that took place at the auto show in Detroit.  Kiley asked Wiedeking why Porsche was not paying a premium for control of VW.  Wiedeking responded, "Why should I pay a premium?  No.  I don't see any reason for this, 29% is enough for Porsche. We won't acquire more than 50%."

51.     At all relevant times, Porsche maintained an English language website with an archive of English language press releases.  Porsche used this website to target its misrepresentations at U.S. investors.  Porsche did not translate all of its press releases into English, but it did translate all of them that related to Porsche's intentions and positions with

respect to VW.   Furthermore, U.S. investors visiting Porsche's U.S. website were directed to Porsche's English language website to obtain investor relations information.

52.     Defendants' wrongful conduct had a substantial effect in the United States and upon United States residents, including Plaintiffs.

53.     Plaintiffs' investment decisions relating to their VW investments were made primarily by U.S. companies located in New York, New York, that contracted to manage Plaintiffs' investments.

54.     As set forth below, in October 2008, each of the Plaintiffs had a significant percentage of U.S. investors, in many cases 100%:

      a.   Approximately 95% of the investors in Elliott Associates, L.P. were located in the United States.  Those U.S. investors owned approximately 95% of Elliott Associates, L.P.

      b.   Elliott International, L.P. had one investor: Elliott International Limited, a Cayman Islands limited company.  Approximately 80% of the investors in Elliott International Limited were located in the United States.  Those U.S. investors owned approximately 70% of Elliott International Limited.  Elliott International Limited invested substantially all of its assets in Elliott International, L.P.

      c.   The Liverpool Limited Partnership had one investor: Elliott Associates, L.P. Approximately 95% of the investors in Elliott Associates, L.P. were located in the United States.  Those U.S. investors owned approximately 95% of Elliott Associates, L.P.

d.  100% of the investors in Glenhill Capital LP were located in the United States.

e.  Approximately 99% of the investors in Glenhill Capital Overseas Master Fund LP were located in the United States.  Those U.S. investors owned approximately 99% of Glenhill Capital Overseas Master Fund LP.

f.  100% of the investors in Glenhill Concentrated Fund LP were located in the United States.

g.  All of the investors in Glenview Capital Partners, L.P. were located in the United States.

h.  Approximately 99% of the investors in Glenview Institutional Partners, L.P. were located in the United States.  Those U.S. investors owned approximately 85% of Glenview Institutional Partners, L.P.

i.  Approximately 28% of the investors in Glenview Capital Master Fund, Ltd. were located in the United States.  Those U.S. investors owned approximately 10% of Glenview Capital Master Fund, Ltd.

j.  All of the investors in GCM Little Arbor Partners, L.P. were located in the United States.

k.  All of the investors in GCM Little Arbor Institutional Partners, L.P. were located in the United States.

l.  Approximately 31% of the investors in GCM Little Arbor Master Fund, Ltd. were located in the United States.  Those U.S. investors owned approximately 24% of GCM Little Arbor Master Fund, Ltd.

m. All of the investors in GCM Opportunity Fund, L.P. were located in the United States.

n. All of the investors in Glenview Capital Opportunity Fund, L.P. were located in the United States.

o. Approximately 24% of investors in Glenview Offshore Opportunity Master Fund, Ltd. were located in the United States. Those U.S. investors owned approximately 48% of Glenview Offshore Opportunity Master Fund, Ltd.

p. Approximately 98% of the investors in Perry Partners L.P. were located in the United States. Those U.S. investors owned approximately 99% of Perry Partners L.P.

q. Approximately 41% of the investors in Perry Partners International, Inc. were located in the United States. Those U.S. investors owned approximately 42% of Perry Partners International, Inc.

55.     As evidenced by Porsche's statements on October 26, 2008, Defendants knew that the primary victims of their scheme would be hedge funds that took short positions in VW shares and that would, as a result of Defendants' strategies, be guaranteed to suffer injuries in the short squeeze. Upon information and belief, Defendants knew that these investors and the managers who make their investment decisions are concentrated in a small number of locations, with the large majority of investment managers based in New York, New York. Therefore, upon information and belief, Defendants knew that New York-based investment managers would rely, in New York, on Defendants' fraudulent misstatements and that the hedge funds they advised would be the primary victims of Defendants' fraud and manipulation.

56.     While VW shares traded on European exchanges, U.S. investors were far more important owners of VW shares than were German institutional investors.  In its 2004 Annual Report, VW reported:

> As the largest single shareholder, the State of Lower Saxony held 18.2% of the ordinary shares. ... A further tranche of shares is held by investment consultant Brandes Investment Partners, LCC [sic], San Diego, California, USA, which notified Volkswagen AG on July 28, 2004 that the total proportion of ordinary shares held by its clients amounted to 10.7% of all ordinary shares (22.2 million ordinary shares and 59.4 million American Depositary Receipts). The proportion of Volkswagen shares held by foreign institutional investors (including Brandes Investment Partners LLC) rose to 38.9% in the year under review (previous year: 34.1%).  German institutional investors held 7.4% (9.3%).

57.     In its 2005 Annual Report, VW reported the continued importance of U.S. investors in VW shares:

> As of December 31, 2005, the subscribed capital of Volkswagen AG comprised 321,929,800 ordinary shares and 105,238,280 preferred shares. As the largest single shareholder, Dr. Ing. h. c. F. Porsche Aktiengesellschaft held 18.5% of the voting shares at the balance sheet date. This corresponds to 14.0% of subscribed capital. The State of Lower Saxony held 18.1% of the ordinary shares or 13.6% of subscribed capital. As of December 31, 2005, Volkswagen AG held 41,719,353 ordinary treasury shares, corresponding to 13.0% of all ordinary shares or 9.8% of subscribed capital. A further tranche of shares is held by investment consultant Brandes Investment Partners, LCC [sic], San Diego, California, USA, which notified Volkswagen AG that the total proportion of ordinary shares held by its clients amounted to 8.58% of all ordinary shares on September 30, 2005. On October 11, 2005, investment management company The Capital Group Companies, Inc., Los Angeles, USA, held 3.504% of the voting capital of Volkswagen AG. The proportion of subscribed capital held by foreign institutional investors – including Brandes Investment Partners, LCC [sic] and The Capital Group Companies, Inc. – was 31.1% in total (previous year: 38.9%). German institutional investors held 7.0% (7.4%).

58.    In its 2006 Annual Report, VW reported:

> At the end of 2006, the subscribed capital of Volkswagen AG comprised 286,980,067 ordinary shares and 105,238,280 preferred shares. Dr. Ing. h.c. F. Porsche Aktiengesellschaft notified us that its share of voting rights in Volkswagen AG on November 13, 2006 was 27.40%, corresponding to 20.0% of subscribed capital. This means that Dr. Ing. h.c. F. Porsche Aktiengesellschaft is the largest single shareholder. The State of Lower Saxony held 20.26% of the ordinary shares on January 20, 2007, corresponding to 14.8% of subscribed capital. In 2006, the proportion of Volkswagen shares held by foreign institutional investors decreased to 23.9% (previous year: 31.1%). German institutional investors held 5.8% (7.0%).

59.    U.S. investors did not limit their purchases of VW shares to those that they executed on foreign exchanges. VW also had (and still has) two sponsored American Depositary Receipt ("ADR") programs. An ADR is a U.S. dollar denominated form of equity ownership in a non-U.S. company. It represents the foreign shares of the company held on deposit by a custodian bank in the company's home country and carries the corporate and economic rights of the foreign shares, subject to the terms specified in the ADR certificate. Both of VW's ADR programs, representing ordinary and preference shares, are sponsored by J.P. Morgan and trade in the U.S. on the over-the-counter ("OTC") market. Each ADR represents one-fifth of a VW share. Upon information and belief, most, if not all, of the ADRs were and are held by American investors.

60.    The following facts demonstrate that Porsche does substantial business in the United States, further establishing, in addition to the other allegations of this Complaint, the minimal American contacts that make personal jurisdiction permissible under the Fifth Amendment:

a.   The United States is the largest market for Porsche automobiles.

b.   Porsche reported that in 2005 it sold over 33,000 automobiles in the United States and Canada, 36,000 each in 2006 and 2007, and 27,000 in 2008.

c.   Porsche does extensive business in the United States through its agent, the wholly owned subsidiary Porsche Automobiles North America, Inc., a Delaware corporation with its principal place of business in Atlanta, Georgia.

61.   Defendants Wiedeking and Haerter were actively involved in managing Porsche's business interests in the United States.  Wiedeking was a member of the boards of directors of Porsche Cars North America, Inc., and Porsche Enterprises Inc., each a Delaware corporation wholly owned by Porsche.  Haerter was a member of the boards of directors of Porsche Cars North America, Inc., Porsche Enterprises, Inc., and Porsche Financial Services Inc., each a Delaware corporation wholly owned by Porsche.

62.   As persons who controlled Porsche's fraudulent misstatements between March and October 2008, and as the direct source of many of those misstatements, Defendants Wiedeking and Haerter are responsible for Porsche's wrongdoing in, and directed toward, the United States.

**VENUE**

63.   Venue is proper in this District pursuant to 28 U.S.C. §1391(d), because Porsche, Wiedeking and Haerter are aliens.  Venue is also proper under 15 U.S.C. §78aa.

**DEFENDANTS' FRAUD AND MANIPULATION**

**A.  Porsche's Early Acquisitions of VW Shares**

64.   Porsche began acquiring VW shares in late September 2005.  By September 28, 2005, Porsche had acquired a 10.26% voting stake in VW and expressed a desire to increase its

ownership interest to 20%. Porsche's stated reason for acquiring VW shares was to lessen the possibility that VW would be subject to a hostile takeover which, Porsche claimed, could threaten business relationships between Porsche and VW.

65.     Discussions about a potential hostile takeover of VW were sparked by speculation that the European Court of Justice would soon invalidate a previous version of the VW Law that limited any one VW shareholder's voting rights to 20%, regardless of the number of shares held. The European Commission already had taken the position that the VW Law violated European Union law, and Porsche believed a hostile takeover attempt might follow invalidation. According to Porsche, its planned investment was "the strategic answer to this risk," but in no case, Porsche said, would its stake "reach the level at which Porsche would have to make a public offer to take over VW[,]" *i.e.,* 30% under applicable German law. Merrill Lynch advised Porsche on the acquisition of VW shares.

66.     Porsche continued with its acquisition of VW shares throughout 2005. On October 7, 2005, Porsche bought a further 8.27% of VW shares from institutional investors and held 18.53% of the total. Porsche acquired shares from, among other investors, Brandes Investment Partners LLC in San Diego.

67.     Because many of VW's shareholders were United States residents, Porsche sought to address American investors' concerns about the motive behind its acquisitions. On October 12, 2005, Porsche employees, including Haerter, met with investors in New York at a meeting sponsored by Merrill Lynch to discuss Porsche's acquisition of VW's shares. The *Financial Times* reported that Porsche recognized "the market's skepticism" about Porsche's acquisition of the VW shares. In response, Porsche wanted to "meet UK and US investors to try to convince them of the merits of its plan."

68.     Throughout the next year, Porsche continually downplayed its acquisition of VW stock.  On January 23, 2006, for example, Porsche's Manfred Ayasse stated: "We [Porsche] control 18.53 percent as well as an option for a further 3.4 percent[, but] there are currently no plans whatsoever of increasing the VW stake beyond this."  On January 27, 2006, Haerter stressed that while Porsche intended to exercise its VW options at some indeterminate date, Porsche would not take its VW stake beyond the roughly 22% it would hold after exercise.  But Porsche would not stay at that level for long.

69.     On February 24, 2006, VW retired a portion of its outstanding shares.  This action increased Porsche's stake to 21% of the total VW shares (or a 25% stake if it exercised options it held to buy additional shares).  Then, on November 13, 2006, Porsche raised its stake from 21% to 27.3% of total VW shares by purchasing shares and exercising options.

70.     While continuing to increase its ownership interest in VW, Porsche announced on November 15, 2006, that it would raise its stake to just below 30%, the threshold at which German law would require it to launch a full tender for VW.

71.     Porsche continued its acquisition of VW shares in 2007.  On, January 10, 2007, *Business Week* reported an interview between its Detroit correspondent David Kiley and Wiedeking that took place at the auto show in Detroit.  During this interview, Wiedeking discredited the idea that Porsche was seeking to obtain control of VW.  Kiley asked Wiedeking why Porsche was not paying a premium for control of VW.  "Why should I pay a premium?," Wiedeking asked in response.  "No. I don't see any reason for this; 29% is enough for Porsche. We won't acquire more than 50%."

72.     Porsche repeated the refrain on March 24, 2007, announcing that it planned to boost its stake to up to 31% but noting "[w]e don't want a majority." Porsche said the decision to

cross 30% followed the February 13, 2007, recommendation by an adviser to Europe's high court that the judges should invalidate the VW Law.  "We expect that law will be repealed entirely," the Porsche spokesman said.

73.     On March 25, 2007, Porsche increased its stake in VW again, moving to 31% from 27.3%.  Porsche reported that the purchase was to prevent hedge funds from taking over and breaking up VW.  "If hedge funds were to break up Volkswagen and publicly list [the company's individual brands] we would risk losing our most important partner. We cannot let such a breakup happen. That's why we acted," Wiedeking said.  The very next day, March 26, Porsche exercised share options to raise its voting stake in VW to 30.9%.  "We can now react even more quickly should hedge funds want to take a stake in VW," Wiedeking told a newspaper.

74.     By March 28, 2007, Porsche held 30.9% of VW's shares.  On account of the 30% ownership, German law required Porsche to submit a full tender bid on the remaining VW shares.  While Porsche made the mandatory bid, it did so at the lowest possible price—a price no rational investor would accept since it was below the then-prevailing market price—and publicly disclaimed any interest in taking over VW outright.

75.     Not surprisingly, VW's board determined that the mandatory offer was too low. VW's board announced that it could not recommend to shareholders that they accept Porsche's tender, as the fundamental valuation of VW shares was higher than Porsche's offer price.

76.     As of December 31, 2007, Porsche was VW's largest shareholder, with approximately 31% of VW's shares.  The State of Lower Saxony held 20.1%.  In the reporting period ending December 31, 2007, VW reported that the proportion of VW shares held by foreign institutional investors had increased to 25.6% (previous year: 23.9%). German

institutional investors held 6.2% (previous year: 5.8%).  On information and belief, a substantial portion of the shares held by foreign investors was held to hedge Porsche's options on VW's shares.

### B. Porsche Misrepresents Its Actual Control over VW Shares to Keep the Acquisition Price as Low as Possible

77.     In an effort to ensure that its increasing stake in VW was hidden from view, Porsche made affirmative misrepresentations that it was neither purchasing nor intending to purchase a quantity of VW shares that could generate a squeeze.

*The False and Misleading Statements:*

Porsche's statement on March 4, 2008, that once "antitrust clearance has been given, Porsche SE will acquire the majority shareholding in Volkswagen, with a view to creating one of the world's most innovative and efficient automotive alliances...."

78.     In its half-yearly Financial Report from Stuttgart, Germany, March 4, 2008, which upon information and belief Dippell emailed into the United States, Porsche stated that once "antitrust clearance has been given, Porsche SE will acquire the majority shareholding in Volkswagen, with a view to creating one of the world's most innovative and efficient automotive alliances...."

79.     Porsche's statement was misleading.  In context, the statement "Porsche SE will acquire the majority shareholding in Volkswagen" tells a reasonable investor that Porsche intended to increase to a share slightly more than the 50% required for clear majority voting.  In addition, the use of the word "alliances" suggests a cooperative working arrangement, not a situation in which one company takes over another, which is the case when a domination and profit transfer agreement is implemented.

80.     In fact, Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating

on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require *at least* 75% ownership.  Furthermore, as of March 4, 2008, Porsche had already entered into options contracts for many of the VW shares that it needed to achieve domination.

Porsche's statement on March 10, 2008, that it would not raise its stake in VW to 75% and that the probability of obtaining 75% from the free float of VW shares was "extremely low"

81.     In a corporate statement from Stuttgart, Germany, on March 10, 2008, which upon information and belief Dippell emailed into the United States, Porsche denied that it would seek to raise its stake to 75% and said talk of such a move "does not consider the realities of VW's shareholder structure.... In view of the fact that the German Federal State of Lower Saxony, as the second major shareholder, holds a stake of more than 20% in [VW], the probability of acquiring the necessary shares from the free float is very small indeed.  The background of the current media reports is obviously provided by rumors on the Stock Exchange which can be traced back to the speculative mind games of analysts and investors."

82.     Porsche's statement that it would not raise its stake in VW to 75% was false.  In fact, Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership.

83.     Porsche's statement that "the probability of acquiring the necessary shares from the free float is very small" was false.  The probability of acquiring the requisite shares for

domination from the free float was, for Porsche, extremely high. Porsche had already entered into options contracts for many of the VW shares it needed to achieve domination. Porsche's counterparties had hedged those options by buying shares. Porsche told analysts at the Frankfurt Auto Show in September 2007, more than six months before its March 4, 2008, half-yearly report, that Porsche could take delivery in physical stock after it exercised its options.

Porsche's statement on May 5, 2008, that Porsche wanted to obtain more than 50% ownership in VW, that Porsche had locked up the ability to do so using options, and that it did not intend to increase its stake to 75%

84.     On May 5, 2008, Gaube told Keith Goodman of Glenhill—who as Gaube well knew was in New York—that Porsche had no intention of increasing its stake in VW to 75%. On information and belief, Gaube was in Stuttgart, Germany when he made the statement.

85.     Porsche's statement was false. Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff. As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership. Furthermore, as early as mid-2008, Porsche had achieved control over nearly 75% of VW shares through outright positions and options.

Porsche's statement on May 29, 2008, about the extent of its planned increase in ownership of VW shares

86.     On May 29, 2008, in a corporate statement from Stuttgart, Germany, Porsche announced that it would raise its stake in VW to more than 50% in 2008: "During the course of this year, [the] share will be increased to over 50%."

87.     Porsche's statement was misleading. In context, the statement "the share will be increased to over 50%" tells a reasonable investor that Porsche intended to increase its share to

slightly more than the 50% required for clear majority voting.  In fact, Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership.  Furthermore, as early as mid-2008, Porsche had achieved control over nearly 75% of VW shares through outright positions and options.

> Porsche's statement on July 28, 2008, about the extent of its planned increase in ownership of VW shares

88.     On July 28, 2008, Defendant Haerter told the German newspaper the *Frankfurter Allgemeine Zeitung*:  "We're determined to cross the 51% threshold this year."  Reuters reported that Haerter told the paper that Porsche owns some 31% in VW, and has secured binding contracts over the purchase of another 5%.  Haerter said Porsche had already secured the purchase price for additional VW shares through financial instruments.  On information and belief, Haerter was in Stuttgart, Germany when he made this statement.

89.     Porsche's statement was misleading.  In context, referring to the "51% threshold" tells a reasonable investor that Porsche intended to increase to a share slightly more than the 50% required for clear majority voting.  In fact, Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership.  Furthermore, as early as mid-2008, Porsche had achieved control over nearly 75% of VW shares through outright positions and options.

<u>Porsche's statement on September 18, 2008, that a domination agreement was "totally unrealistic"</u>

90.     On September 18, 2008, in a corporate statement that, upon information and belief, Porsche made from Stuttgart, Germany, Porsche told an online magazine that a domination agreement with VW was "totally unrealistic."

91.     Porsche's statement was false. Porsche already had decided to seek domination of VW. Ferdinand Piech, who resigned as a member of the Executive Committee of Porsche's Advisory Board because "vital information" about Porsche's options in VW was concealed from him, admitted in a May 2009 interview that even he knew of Porsche's plan to increase its stake in VW up to 75% as early as mid-year 2008.

92.     Porsche also had the ability to obtain sufficient shares to achieve domination. Porsche had entered into options contracts for virtually all of the VW shares it needed to achieve domination. Porsche knew that its counterparties had hedged those options by buying shares. Porsche knew that the hedge shares were available from its counterparties whenever it chose to settle its options. Porsche told analysts at the Frankfurt Auto Show in September 2007 that it could take delivery in physical stock when it exercised these types of options.

<u>Porsche's statement on October 2, 2008, that domination was only a "theoretical option"</u>

93.     On October 2, 2008, Defendant Wiedeking announced at the Paris Motor Show that Porsche planned to increase its stake in VW to more than 50% before the end of the year. As to domination, Wiedeking said, "We do not want to rule out this possibility at the end of the day, some point in the future," but for now, he continued, domination is a "purely theoretical option."

94.     Wiedeking's statement that Porsche planned to increase its stake in VW to more than 50% before the end of 2008 was misleading for the same reasons described above for nearly identical statements.  Wiedeking's statement that, as to domination, "We do not want to rule out this possibility at the end of the day, some point in the future" and his statement that domination was a "purely theoretical option" were false.  Porsche already had decided to seek domination of VW.

95.     Porsche also had the ability to obtain sufficient shares to achieve domination. Porsche had entered into options contracts for virtually all of the VW shares it needed to achieve domination.  Porsche knew that its counterparties had hedged those options by buying shares. Porsche knew that the hedge shares were available from its counterparties whenever it chose to settle its options.  Porsche told analysts at the Frankfurt Auto Show in September 2007 that it could take delivery in physical stock when it exercised these types of options.

Porsche's statement on October 5, 2008, that 75% ownership was "out of the question at present"

96.     On October 5, 2008, Defendant Wiedeking told *Manager Magazine* online that that a domination agreement was "a long term possibility...."  The 75%, he said, "is out of the question at present."  Upon information and belief, Wiedeking was in Stuttgart, Germany when he made these statements.

97.     Porsche's statement on October 5, 2008, that a domination agreement was "a long term possibility" but that "[t]he 75 percent is out of the question at present" was false because Porsche had the intention to take domination of VW in the very near future.

Porsche's statement on October 22, 2008, that Porsche had no intention of increasing its stake in VW to much beyond 51% of VW shares and did not intend to increase its stake in VW to 75% of VW shares

98.     On October 22, 2008, Gaube participated in a phone call with Glenview's Larry Robbins, who was in New York, as Gaube was well aware. On the call, Gaube told Robbins that Porsche had no intention of increasing its stake in VW to much beyond 51% of VW shares and that it did not intend to increase its stake to 75% of VW shares.

99.     Porsche's statement was false because Porsche had the intention to take domination of VW in the very near future.

### C. The Materiality of Porsche's False and Misleading Statements

100.     Porsche's false and misleading statements were material. No reasonable investor would have sold VW shares short (or, equivalently, entered into the short side of security-based swaps) had it known of Porsche's plans to acquire 75% of VW, because—combined with Porsche's control of VW shares through options—Porsche's purchases guaranteed that short sellers would suffer a short squeeze in VW shares.

### D. Porsche's Intention that Its False and Misleading Statements Would Deceive Market Participants Such as Plaintiffs

101.     The following facts show that Defendants intended to deceive Plaintiffs and other investors about Porsche's intentions with respect to acquiring VW's shares:

> a. Porsche planned to take domination of VW at least as early as February 2008. Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff. As the German press first reported in May 2009, Porsche there stated its intention to

implement a domination and profit transfer agreement, both of which require at least 75% ownership.

b.  Porsche had a plan to keep its takeover strategy secret.  Porsche's head of investor relations admitted on October 30, 2008, that Porsche took pains to keep its true strategy secret: "We are a very small company buying into a very big company. That is not something you can afford if everybody is able to read your strategy in the newspaper."

c.  VW's chairman, Ferdinand Piech, who was on Porsche's supervisory board before resigning, has admitted publicly that Porsche had decided to increase its stake up to 75% even when it was telling the market otherwise.  In an interview published on May 12, 2009, Piech revealed that as early as mid-year 2008, Porsche had decided to increase its stake in Volkswagen up to 75%.

**E. Porsche Executes the Short Squeeze**

102.  On October 26, 2008, after reaching agreement with VW's chairman Piech on the terms of Porsche's takeover of VW, Porsche revealed the truth to Plaintiffs and the public markets in order to set the short squeeze in motion.

103.  On that date, Porsche revealed for the first time that it already controlled almost 75% of VW shares.  In an October 26, 2008 press release, which upon information and belief Gaube emailed into the United States, Porsche said: "At the end of last week, Porsche SE held 42.6 percent of the Volkswagen ordinary shares and in addition 31.5 percent in so called cash settled options relating to Volkswagen ordinary shares to hedge against price risks, representing a total of 74.1%."

104.    By referring to the cash settled options as "so called," Porsche communicated that those options entitled it to more than just cash upon exercise.  Porsche underlined this point by adding the percentage of VW shares underlying its options to the percentage of VW shares it held outright.   This was something Porsche had *never* done in any of its previous announcements.  On September 16, for example, a Porsche press release had described the VW shares it owned outright as its "total stake."  The sudden change in characterization, coupled with Porsche's use of the words "so called," signaled that Porsche believed it controlled the VW shares underlying its cash settled options, just as it controlled the VW shares it owned outright.

105.    Porsche's new and surprising message was received loud and clear by multiple press outlets on October 27, 2008, and October 28, 2008, including two of the most prestigious business publications in the United States:

> Porsche Automobil Holding SE on Sunday said it had a near-75% stake in Volkswagen AG a much larger stake than the market expected, and said it wanted to tighten its grip on Volkswagen with a so-called domination agreement that would give it access to Volkswagen's cash flows.

> Porsche announced it had control of 31.5% of Volkswagen through cash-settled options in addition to the 42.6% of shares it currently holds, leaving it just 0.9% short of the 75% level needed to log Volkswagen's revenues and assets in its own books.

> Previously, Porsche's Volkswagen stake was known to be 35.14% plus an undisclosed number of options.

Christoph Rauwald, "Porsche Gains Nearly 75% of VW, Tightening Grip," B3,

*Wall Street Journal*, October 27, 2008.

> The automakers jumped after Porsche reported Sunday its cash-settlement options equal almost a 32% ownership stake in the company, as well as a 43% stake in the company's common shares.

> That increased Porsche's known holdings of its compatriot automaker to just below the 75% threshold needed for majority

> control under German law. Previous information showed Porsche
> holding a one-third share.

Alan R. Elliott, "Porsche Stake Boosts Ailing Automakers," B03, *Investor's Business Daily*,

October 28, 2008. (emphasis added)

> Porsche said it had increased its effective holding of ordinary VW
> shares to 74.1 percent of the total. That is up from mid-September,
> when Porsche said its stake was 35.14 percent. VW is a heavily
> shorted stock, so when Porsche's announcement came out,
> implying that an already-small public float had shrunk further, the
> short bet immediately became riskier. That likely persuaded short-
> sellers to snap up VW shares to reduce or close their bets, leading
> to the rip-roaring rally.

Peter Eavis, "Porsche's New Spin on VW," Heard on the Street, C12, *Wall Street Journal*,

October 28, 2008.

106.   Porsche also went on to admit, contrary to Defendants' earlier statements, that it

sought to acquire 75% of VW's shares and "dominate" VW.   "Assuming the economic

framework conditions are suitable," Porsche said in the same October 26, 2008, press release,

"the aim is to increase to 75% in 2009, paving the way to a domination agreement."   Far from

being "totally unrealistic," as Porsche had claimed just weeks earlier, domination of VW was

well within Porsche's grasp, as it had been when Porsche made its earlier false statements.

107.   At the time of Porsche's announcement of the true extent of its control of VW

shares and its true intentions with respect to VW, the short interest in VW was about 13%.

Porsche's acquisition of control over 74.1% of VW's shares, combined with Lower Saxony's

well-known ownership of approximately 20%, meant that the free float available to short sellers

to cover their positions was only about 6% of VW's shares.   Porsche's corner meant that the

short interest was more than twice the free float, virtually guaranteeing a short squeeze.

## CAUSES OF ACTION

### COUNT I
### (SECURITIES FRAUD BASED ON FALSE AND MISLEADING STATEMENTS IN VIOLATION OF §10(b) OF THE EXCHANGE ACT AND RULE 10b-5)
### Against All Defendants

108.   Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1–107 of this Complaint.

109.   Defendants carried out a plan, scheme and course of conduct which was intended to and did (i) deceive Plaintiffs and other investors, as alleged herein; and (ii) cause Plaintiffs and other investors to sell VW shares (or enter into the short side of security-based swaps) at artificially low prices from March 4, 2008, through October 24, 2008, and buy VW shares (or otherwise terminate short security-based swaps) at artificially high prices from October 27, 2008, through at least October 31, 2008.

110.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

111.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the buyers and sellers of VW's shares in violation of §10(b) of the Exchange Act and Rule 10b-5.

112.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

113.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal their true intentions with respect to acquiring 75% of VW's shares and the contracts they put in place to do so.

114.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs from March 4, 2008, through October 24, 2008, that Porsche had no intention of acquiring 75% of VW's shares, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make their statements about Porsche's intentions with respect to acquisition of VW's shares not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the sellers of VW's shares, including Plaintiffs, from March 4, 2008, through October 24, 2008.

115.    Defendants' false and misleading statements are alleged in ¶¶ 77–99 above.

116.    Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged herein.

117.    Defendants made their material misrepresentations and/or omissions knowingly and for the purpose and effect of concealing their true intentions with respect to the acquisition of VW's shares.

118.    The primary liability of Wiedeking and Haerter arises from the fact that each of them was a high-level executive at Porsche responsible for Porsche's acquisition of VW's shares, and each of them made statements to the public and contributed to or reviewed Porsche's press releases, as alleged in this Complaint, concerning Porsche's acquisition plans with respect to VW's shares.  Each of them was aware of Porsche's dissemination of information to the

investing public concerning Porsche's acquisition plans with respect to VW's shares that they knew to be materially false and misleading.

119.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, alleged above, the market price of VW shares was artificially depressed from March 4, 2008, through October 24, 2008, and artificially inflated from October 27, 2008, through at least October 31, 2008.

120.    Defendants' misrepresentations and omissions caused Plaintiffs' losses. In ignorance of the fact that the market price of VW's shares was artificially depressed, and relying directly or indirectly on the false and misleading statements made by Defendants and described herein, or upon the integrity of the market in which VW's shares trade, and/or in the absence of material adverse information that was known to Defendants, but not disclosed in public statements by Defendants from March 4, 2008, through October 24, 2008, Plaintiffs sold VW shares (and entered the short side of security-based swaps on VW shares) at artificially low prices, and bought VW shares (or otherwise terminated short security-based swaps) at artificially high prices from October 27, 2008, through at least October 31, 2008.

121.    At the time of Defendants' misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true. Each Plaintiff constantly reviewed press reports on Porsche's investment in VW and considered press reports for their relevance to each of its investment decisions. Had Plaintiffs known the truth regarding Porsche's true intentions with respect to the acquisition of VW's shares, Plaintiffs would not have sold short VW's shares (or, what is economically equivalent, would not have entered the short side of security-based swaps on VW shares), or, if they had sold short VW's shares (or had entered the short side of

security-based swaps on VW shares), they would not have done so at the artificially low prices which they accepted.

122.    The market for VW's shares was, at all times, an efficient market that promptly digested current information with respect to VW from publicly available sources and reflected such information in the prices of VW's shares and associated security-based swaps.

123.    VW's shares were traded on a number of markets, including Deutsche Bourse markets and in the United States through Volkswagen's sponsored ADR facility.  VW shares were included in major market indices including the DAX.

124.    The market price of VW's shares reacted promptly to the dissemination of public information regarding VW.

125.    Security analysts followed VW and published research reports regarding VW that were publicly available to investors.

126.    The "fraud-on-the-market" theory applies.  Plaintiffs justifiably relied on the integrity of the market price for VW's shares and were substantially damaged as a direct and proximate result of their sales of VW shares at artificially depressed prices and the subsequent increase in the price of VW shares when the truth was disclosed.

127.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5.

128.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective short sales of, and security-based swaps in, VW's shares from March 4, 2008, through October 24, 2008, and their purchases of VW shares (or other termination of short security-based swaps) at artificially high prices from October 27, 2008, through at least October 31, 2008.

41

## COUNT II
### (MARKET MANIPULATION IN VIOLATION OF §10(b) OF THE EXCHANGE ACT AND RULE 10b-5)
### Against All Defendants

129.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1–128 of this Complaint.

130.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in manipulative acts that kept the price of VW's shares artificially low from March 4, 2008, through October 24, 2008, and then resulted in a short squeeze that drove the price of VW's shares to artificially high levels on and after October 27, 2008, through at least October 31, 2008.

131.    Defendants' market manipulation caused Plaintiffs' losses. Defendants' market manipulation caused Plaintiffs to sell VW shares short, or enter into the economically equivalent short side of security-based swaps on VW shares, at artificially low prices from March 4, 2008, through October 24, 2008. Defendants' market manipulation caused Plaintiffs to purchase VW shares or otherwise terminate their exposures to the short sides of security-based swaps on VW shares at artificially high prices on and after October 27, 2008, through at least October 31, 2008.

132.    At the time of Defendants' manipulation, Plaintiffs were ignorant of Defendants' manipulative acts. Had Plaintiffs known the truth regarding Porsche's true intentions with respect to the acquisition of VW's shares, or had Plaintiffs known that Defendants had hidden the extent of their control of additional VW shares through deceptive distribution of options trades designed to evade counterparty disclosure laws, Plaintiffs would not have sold short VW's shares (or, what is economically equivalent, would not have entered the short side of security-based swaps on VW shares), or, if they had sold short VW's shares (or had entered the short side

42

of security-based swaps on VW shares), they would not have done so at the artificially low prices which they accepted.

133.    The market for VW's shares was, at all times, an efficient market that promptly digested current information with respect to VW from publicly available sources and reflected such information in the prices of VW's shares and associated security-based swaps.

134.    VW's shares were traded on a number of markets, including Deutsche Bourse markets and in the United States through Volkswagen's sponsored ADR facility.  VW shares were included in major market indices including the DAX.

135.    The market price of VW's shares reacted promptly to the dissemination of public information regarding VW.

136.    Security analysts followed VW and published research reports regarding VW that were publicly available to investors.

137.    As a result of the misconduct alleged herein, the market for VW's shares was artificially depressed from March 4, 2008, through October 24, 2008, and artificially inflated from October 27, 2008, through at least October 31, 2008.

138.    The "fraud-on-the-market" theory applies.  Plaintiffs justifiably relied on the integrity of the market price for VW's shares and were substantially damaged as a direct and proximate result of their sales of VW shares at artificially depressed prices and the subsequent increase in the price of shares when the truth was disclosed.

139.    Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged herein, and intended to deceive Plaintiffs and hide the extent of Porsche's control of additional VW shares through deceptive distribution of options trades designed to evade counterparty disclosure laws.  Defendants engaged in their deceptive conduct knowingly

and for the purpose and effect of concealing their true intentions with respect to the acquisition of VW's shares.

140.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5.

141.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective short sales of, and security-based swaps in, VW's shares from March 4, 2008, through October 24, 2008, and their purchases of VW shares (or other termination of short security-based swaps) at artificially high prices from October 27, 2008, through at least October 31, 2008.

## COUNT III
### (VIOLATIONS OF §20(a) OF THE EXCHANGE ACT)
### Against All Defendants

142.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1–141 of this Complaint.

143.    Wiedeking and Haerter each acted as a controlling person of Porsche within the meaning of §20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of Porsche's acquisition plans with respect to VW shares, Wiedeking and Haerter each had the power to influence and control, directly or indirectly, the decisionmaking of Porsche, including the content and dissemination of the press releases concerning Porsche's intentions with respect to the acquisition of VW's shares. Porsche controlled Wiedeking and Haerter and all of its other employees.

144.    As set forth above, Porsche, Wiedeking and Haerter each violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.    By

virtue of their positions as controlling persons, Defendants are each liable pursuant to §20(a) of the Exchange Act.

145.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their sales of VW shares from March 4, 2008, through October 24, 2008, and in connection with their purchases of VW shares from October 27, 2008, through at least October 31, 2008.

### COUNT IV
### (COMMON-LAW FRAUD)
### Against Porsche

146.   Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1–145 of this Complaint.

147.   Porsche made material misrepresentations and material omissions of fact which were false and which Porsche knew to be false.

148.   Porsche made material misrepresentations and material omissions of fact for the purpose of inducing Plaintiffs to rely upon them.

149.   Plaintiffs justifiably relied on the material misrepresentations and material omissions of fact.

150.   Plaintiffs were injured by their justifiable reliance on Porsche's material misrepresentations and material omissions of fact.

WHEREFORE, Plaintiffs each demand judgment against Defendants as follows:

(i)      on Count I for damages in an amount to be proven at trial;

(ii)     on Count II for damages in an amount to be proven at trial;

(iii)    on Count III for damages in an amount to be proven at trial;

(iv)    on Count IV for damages in an amount to be proven at trial; and

(v)      for such further relief as the Court may deem just and proper.


DATED:        January 25, 2010                    Respectfully submitted,


                                                  Philip S. Beck
                                                  Kaspar J. Stoffelmayr
                                                  James B. Heaton, III, Ph.D.
                                                  John D. Byars
                                                  Vincent S. J. Buccola
                                                  BARTLIT BECK HERMAN
                                                  PALENCHAR & SCOTT LLP
                                                  54 West Hubbard Street, 3rd Floor
                                                  Chicago, Illinois  60654
                                                  Telephone:  (312) 494-4400
                                                  Facsimile:  (312) 494-4440

                                                         - and -

                                                  KLEINBERG,   KAPLAN,   WOLFF   &
                                                  COHEN, P.C.

                                                  By:_____
                                                  David Parker (DP-1075)
                                                  551 Fifth Avenue, 18th Floor
                                                  New York, New York  10176
                                                  Telephone:  (212) 986-6000
                                                  Facsimile:  (212) 986-8866