IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Elliott Associates, L.P.; Elliott International, L.P.; The Liverpool Limited Partnership; Canyon Capital Arbitrage Master Fund, Ltd.; Canyon Balanced Master Fund, Ltd.; Canyon Value Realization Fund (Cayman) Ltd.; Canyon Value Realization Fund, L.P.; D. E. Shaw Valence International, Inc.; Glenhill Capital LP; Glenhill Capital Overseas Master Fund LP; Glenhill Concentrated Fund LP; Glenview Capital Partners, L.P.; Glenview Institutional Partners, L.P.; Glenview Capital Master Fund, Ltd.; GCM Little Arbor Partners, L.P.; GCM Little Arbor Institutional Partners, L.P.; GCM Little Arbor Master Fund, Ltd.; GCM Opportunity Fund, L.P.; Glenview Capital Opportunity Fund, L.P.; Glenview Offshore Opportunity Master Fund, Ltd.; Greenlight Capital, L.P.; Greenlight Capital Qualified, L.P.; Greenlight Capital Offshore Partners; Greenlight Reinsurance, Ltd.; Ironbound Partners LP; Ironbound Partners Overseas Ltd.; Perry Partners L.P.; Perry Partners International, Inc.; Royal Capital Value Fund, LP; Royal Capital Value Fund (QP), LP; RoyalCap Value Fund, Ltd.; RoyalCap Value Fund II, Ltd.; Tiger Global, L.P.; Tiger Global II, L.P.; and Tiger Global, Ltd., | ECF CASE<br><br>10 Civ 0532 (HB)(THK)<br><br>(Jury Demanded)<br><br>**AMENDED COMPLAINT** |
| Plaintiffs, | |
| -versus- | |
| Porsche Automobil Holding SE, f/k/a Dr. Ing. h.c. F. Porsche AG; Wendelin Wiedeking; and Holger P. Haerter, | |
| Defendants. | |

Plaintiffs, by their attorneys, allege the following based on Plaintiffs' personal knowledge and their counsel's investigation. Counsel's investigation included review of press releases by Volkswagen AG ("VW") and Defendant Porsche Automobil Holding SE, f/k/a Dr. Ing. h.c. F. Porsche AG ("Porsche," and along with Porsche's former Chief Executive Officer Wendelin Wiedeking ("Wiedeking") and former Vice President of Finance Holger P. Haerter ("Haerter"), the "Defendants"), private and public statements by Defendants, security analysts' reports

concerning Porsche and VW, Porsche's and VW's financial disclosures, and news reports about Porsche and VW. A reasonable opportunity for discovery likely will reveal substantial additional evidentiary support for the allegations set forth below.

## NATURE OF THE ACTION

1.  Plaintiffs were victims of what the financial press has called "a massive short squeeze" (Reuters) and "a short squeeze of historic proportions" (*New York Times*).[1] Plaintiffs, all of whom are funds advised in the United States, lost more than $2 billion as a direct result of the fraud and manipulation alleged below.

2.  During 2008, the voting shares of VW ("VW shares") appeared increasingly overvalued relative to the shares of other publicly traded automobile companies. By late 2008, Plaintiffs had short positions in VW shares. This meant that Plaintiffs had borrowed VW shares and sold them, undertaking an obligation to repurchase the shares and return them at a future date. Absent any compelling rationale for why VW shares would trade at such high levels, and in reliance on Porsche's express denials that it would take over VW in the near future, Plaintiffs believed that their short sales would be profitable. Unknown to Plaintiffs, however, Porsche, at the direction of defendants Wiedeking and Haerter, was cornering the market in VW shares and was carefully managing the price of VW shares to induce the Plaintiffs to enter into short sales as a means by which Porsche could acquire more and more VW shares. Plaintiffs did not know that

---

[1] In a short squeeze, "the price of a stock is inflated to levels at which the short seller can no longer accept the costs associated with maintaining the short position, or at which the risk of loss is increased beyond acceptable levels, forcing the short seller to 'cover' his position. This has the dual effect of removing the short seller from the company's market and further increasing demand for the company's stock, as the short seller must purchase the inflated shares from the limited amount available in the public market." *Rocker Mgmt. L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 U.S. Dist. LEXIS 16854, *6 (D.N.J. June 7, 2005).

(1) they were selling borrowed shares to Porsche, directly and indirectly, and (2) that Porsche had launched a secret plan to use shares it controlled to take over VW. In essence, Porsche lured the Plaintiffs into a trap, making Plaintiffs believe VW shares were overvalued while hiding from Plaintiffs the risk of a massive short squeeze that soon would send the price skyrocketing several hundred percent.

3.      Porsche sprung the trap on October 26, 2008. That day, Porsche revealed the vast extent of its holdings of VW shares (including shares it controlled through options-contract counterparties, discussed below) and lifted the veil on its plan to take over VW. Porsche's intended consequence was a short squeeze in which the price of VW shares shot upwards. Porsche made massive profits at the expense of Plaintiffs, who lost tremendous amounts of money covering short positions at artificially high prices. Porsche did so to protect the value of its huge position in VW shares, the value of which had been slipping with prices in stock markets around the world as the financial crisis of 2008 picked up speed.

4.      A chart representing the closing price of VW shares from March through November, 2008, demonstrates the short squeeze's dramatic effect:



3

5. By breaking the law, Porsche cornered the market in VW shares and induced Plaintiffs to short sell VW shares to Porsche or Porsche's counterparties. Specifically, Porsche cornered the market in VW shares (1) with false denials of its intent to take over VW and (2) by engaging in a series of manipulative derivatives trades to hide the extent to which Porsche controlled VW shares.

6. The story of Porsche's fraud and manipulation begins in early 2008. On February 25, 2008, Porsche representatives held a secret meeting in Berlin with a high-ranking officer of the German State of Lower Saxony participating on behalf of Prime Minister Christian Wulff. (Lower Saxony owned slightly more than 20% of VW's shares at all relevant times.) At the meeting, according to German press accounts that surfaced more than a year later, Porsche disclosed to Lower Saxony its intention to implement a "domination agreement" with VW. A domination agreement between an acquiring firm and a target firm allows the acquiring firm to control the target firm's decisions.[2] Typically a bidder can put a domination agreement into place after acquiring 75% of the voting shares of the target company. But VW's articles and a German law known as the "VW Law" required approval by holders of 80% of VW's shares, 5% more than the typical threshold. Nevertheless, Porsche sought to obtain ownership of 75% of VW's shares as a first step toward domination. With 75% ownership, Porsche could achieve domination if (1) it was able to strike a deal for domination with Lower Saxony, or (2) the European Court of Justice abolished the restrictions raising the requirements for domination over VW from 75% to 80%, as Porsche expected eventually would occur. Porsche set out to secretly build its stake toward 75%.

---

[2] See Thomas Stohlmeir, *German Public Takeover Law: Bilingual Edition with an Introduction to the Law* 119–120 (2002).

4

7.  In order to accomplish their goal, Defendants needed to hide their plan while they acquired control over nearly 75% of VW's shares. Defendants hid their plan in two ways.

8.  The first way that Defendants hid their plan was by lying, both to the market and, in several cases, directly to Plaintiffs in phone conversations between Frank Gaube ("Gaube"), Porsche's head of investor relations, and certain Plaintiffs' New York-based investment professionals. From March 2008 until just days before it revealed the truth, Porsche consistently denied that it was seeking to take over VW and said that it would not raise its stake above a simple majority. These statements were false, since Porsche had decided to take over VW at least as early as February 2008, and as early as mid-2008 had achieved control of nearly 75% of VW stock through outright positions and call options as alleged in more detail below. After the short squeeze, Gaube publicly admitted that Porsche had intentionally kept its true strategy secret: "We are a very small company buying into a very big company. That is not something you can afford if everybody is able to read your strategy in the newspaper."

9.  VW also knew that Porsche was lying about its intentions. In an interview published on May 12, 2009, VW chairman and Porsche shareholder Ferdinand Piech conceded that Porsche had decided to increase its stake in VW up to 75% as early as mid-year 2008. Whether that is the first time Piech and VW learned of Porsche's secret plan remains to be determined in discovery, but Piech's admission demonstrates that Porsche lied, for example, on September 18, 2008, when it told an online magazine that a domination agreement with VW was "totally unrealistic." If Piech and VW understood the extent of Porsche's control at the time of that statement, then Piech and VW also knew that Porsche was lying.

10. The second way that Defendants hid their plan was by manipulating the market in VW shares. Porsche concealed its plan by acquiring much of its position in VW shares through

5

options contracts it entered into in 2007 and 2008. Porsche used these contracts to ambush the market. Two features of Porsche's options trades made them manipulative.

11. The first feature that made Porsche's options trades manipulative was that Porsche disguised physical options contracts—contracts that it should have disclosed but did not—as cash-settled options contracts that did not have the same disclosure requirements. That Porsche did not really consider its options contracts to be cash settled is clear from what Porsche said when it revealed the truth to the market on October 26, 2008. Porsche admitted that day that its options actually reflected part of its "74.1%" control and, lest anyone doubt Porsche's control over the shares represented by the option contracts, minimized the cash settled nature of the contracts by calling them the "so called" cash-settled options. Porsche used the options as a means to acquire control over VW shares, not as a means to benefit, in cash, from a rise in the price of VW shares. Since Porsche had the ability and intention to convert these options into actual share ownership, it should have disclosed its position under applicable law, but it did not do so.

12. The second feature that made Porsche's options trades manipulative was that Porsche methodically parceled out its option contracts to evade counterparty-disclosure requirements. Porsche knew that the counterparties to its options contracts would purchase VW shares to hedge the options. But if any one of Porsche's counterparties acquired too high a percentage of VW's shares as hedges, that counterparty would have its own legal obligation to disclose its ownership of those hedging shares, threatening indirectly to expose Porsche's accumulation of control over VW shares. Any counterparty's disclosure would alert the market that someone had entered into large derivatives positions with that counterparty. The market then would be able to infer that a takeover of VW was in progress, as it would be clear that

6

someone was acquiring control of VW's shares using options contracts purchased from the disclosing counterparty.

13. To make sure the truth remained hidden, Porsche had to, and did, divide up its options contracts among numerous counterparties. In describing Porsche's options strategy in a private phone call between New York and Germany, Gaube told Plaintiffs Greenlight Capital, L.P., Greenlight Capital Qualified, L.P., Greenlight Capital Offshore Partners, and Greenlight Reinsurance, Ltd. that Porsche did not want to "put all eggs in one basket" because that made it "easier for us [*i.e.*, Porsche] to not be visible, not be too visible in the market."[3] In that same conversation, Gaube expressly denied that concerns with counterparty risk had motivated Porsche's practice of spreading around its options trades, the only other plausible explanation for spreading around options trades among counterparties the way Porsche did. A court in this District recently recognized the deceptive nature of such intentional efforts to parcel out trades to evade the need for a counterparty to disclose shares it held as hedges. *See CSX Corp. v. The Children's Investment Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511 (S.D.N.Y.), *aff'd*, 292 Fed. Appx. 133 (2d Cir. 2008). Porsche engaged in the same deception here.

14. Porsche's intentional misrepresentations and manipulative acts induced the Plaintiffs to sell VW shares short. Plaintiffs relied on the market to provide an honest price. In determining that VW shares did not reflect fundamental value, Plaintiffs relied on Porsche's various public statements with regard to its ownership of VW shares, and Plaintiffs relied on the absence of any disclosed accumulation of VW shares. Certain Plaintiffs also relied on various private statements that Gaube made to them, as detailed further below. Those private statements

---

[3] These Plaintiffs understood Gaube's comments to apply to the options through which Porsche would acquire a majority of VW shares, since Gaube expressly denied in that same conversation (as detailed further below) that Porsche was going to 75% ownership.

7

also corroborate the Plaintiffs' allegations as to Porsche's bad intent with respect to the many deceptive public statements and manipulative acts detailed in this Amended Complaint. Privately and publicly, Porsche misled Plaintiffs with regard to its ownership of VW shares and its intentions regarding acquisition of 75% of VW shares. Given the facts available to them, Plaintiffs determined that the price of VW shares was too high. What Plaintiffs could not see, because of Porsche's fraud and manipulation, was that VW shares were trading at prices that did not reflect Porsche's concealed demand for additional shares and the risk of a massive short squeeze.

15. In one-on-one phone conversations between New York and Germany, Porsche's Gaube consistently told New York-based investment managers that Porsche did not intend to raise its VW stake above a simple majority and denied that Porsche intended to increase its stake in VW shares to 75%.

    a. On May 5, 2008, Gaube spoke by telephone to Keith Goodman, who was in New York. Upon information and belief, Gaube knew Goodman was in New York at the time of the phone call. Goodman was an analyst responsible for helping Plaintiffs Glenhill Capital LP, Glenhill Capital Overseas Master Fund LP, and Glenhill Concentrated Fund LP decide what positions to take in the market. During the telephone call, Gaube told Goodman that Porsche wanted to get to more than 50% ownership in VW and, toward that goal, had used options to lock up 20% of VW shares, in addition to the approximately 31% it already owned outright. Gaube told Goodman that Porsche had no intention of increasing its stake in VW to 75%.

b. On October 20, 2008, Gaube spoke by telephone with David Einhorn, who was in New York. Upon information and belief, Gaube knew Einhorn was in New York at the time of the phone call. Einhorn had final authority to make all trading decisions for Plaintiffs Greenlight Capital, L.P., Greenlight Capital Qualified, L.P., Greenlight Capital Offshore Partners, and Greenlight Reinsurance, Ltd. Gaube told Einhorn that Porsche was not going to 75%, that "going to 75% is not on the agenda," and specifically denied controlling almost all the float of VW shares. Gaube also expressly disavowed the speculation of one analyst, Max Warburton of Alliance Bernstein, who, on October 17, 2008, had offered in the form of a Bernstein Research analyst report a seemingly speculative argument that Porsche might be accumulating additional control of VW shares. Gaube claimed to have "talked to a number of investors and analysts" to refute Warburton's theory, which Gaube called "complete bullshit." Gaube implied that Porsche viewed VW shares as overvalued at current prices, telling Einhorn that Porsche did not want "to pay ridiculous prices for VW shares."

c. On or about October 20, 2008, Gaube spoke by telephone with Neeraj Chandra, who was in New York. Upon information and belief, Gaube knew Chandra was in New York at the time of the phone call. Chandra was an analyst responsible for helping Plaintiffs Tiger Global, L.P., Tiger Global II, L.P., and Tiger Global, Ltd. decide what positions to take in the market. Gaube told Chandra that Porsche had options that would allow it to take its

stake in VW shares to 50–55%, but told Chandra that the accumulation would stop there.

    d. On October 22, 2008, Gaube spoke by telephone with Larry Robbins, who was in New York. Upon information and belief, Gaube knew that Robbins was in New York at the time of the phone call. Robbins had final authority to make all trading decisions for Plaintiffs Glenview Capital Partners, L.P., Glenview Institutional Partners, L.P., Glenview Capital Master Fund, Ltd., GCM Little Arbor Partners, L.P., GCM Little Arbor Institutional Partners, L.P., GCM Little Arbor Master Fund, Ltd., GCM Opportunity Fund, L.P., Glenview Capital Opportunity Fund, L.P., and Glenview Offshore Opportunity Master Fund, Ltd. During the telephone call, Gaube told Robbins that Porsche did not intend to go much above 51% ownership in VW and did not intend to go to 75%.

16. Defendants' fraud and manipulation had an effect on the price at which Plaintiffs entered into short sales of VW shares. By hiding both the true extent of Porsche's control over VW shares and its intention to acquire additional shares up until the October 26 announcement, Defendants led Plaintiffs and other investors to believe, incorrectly, that the natural interplay of supply and demand determined the then-current prices of VW shares. In fact, both the supply of and demand for VW shares were skewed by Defendants' fraud and manipulative acts.

17. The demand for VW shares was in truth greater than market prices indicated, because Defendants wrongfully concealed the efforts of Porsche and its options-contract counterparties to corner the market in VW shares during 2008. At the same time, the supply of VW shares was in truth less than market prices indicated, because Defendants' fraud and

manipulation hid the extent to which Porsche had cornered the market in the free float of VW shares. By thus hiding the extent to which Porsche had completely cornered the market in VW shares – an effort Porsche began no later than March 2008 and accomplished as early as mid-2008 – Defendants induced Plaintiffs to take short positions from March 3, 2008 to October 26, 2008. Based on the information available to them, Plaintiffs believed that the price of VW shares was too high, but Defendants' carefully orchestrated fraud and manipulation had the effect of keeping the price of VW shares lower than would have existed had all of the facts been made public, and exposed Plaintiffs to the risk of a massive short squeeze, a risk that materialized in late October 2008.

18.   Had the market and the Plaintiffs been aware that Porsche intended to take over VW and that Porsche had cornered the market in VW shares to do so (*i.e.*, that actual demand for VW shares was higher than it appeared), the price of VW shares would have been much higher, the risk in shorting VW shares would have been fully apparent, and Plaintiffs would not have shorted VW shares.

19.   On October 26, 2008, just days after Gaube had been giving assurances by phone to New York-based investment managers that Porsche did not intend to go above a simple majority, Porsche set the short squeeze in motion by revealing the truth. Porsche said it had become "apparent that there were considerably more short positions in the market than expected." This statement was a pretext. Defendants had long known (at least since the beginning of March 2008) that investors had been shorting VW shares because Porsche knew it could not have achieved control of 75% of VW's shares without inducing Plaintiffs and other market participants to sell the stock short.

20. Porsche's secret plan was to control 75% of VW shares. But Porsche faced a mathematical problem: more than 25% of VW shares were controlled by shareholders who would not or, effectively, could not sell their VW shares to Porsche. The largest of the shareholders who would not sell their VW shares to Porsche was the State of Lower Saxony, which controlled 20% of VW shares. There were other investors, notably index funds, who were required to hold VW shares to track indices that included VW shares. Upon information and belief, based on investigation of publicly and privately available sources, those investors owned more than 5% of VW shares.

21. Thus, as a practical matter, it was impossible for Porsche to acquire control of 75% of VW shares without short sellers. Short sellers could increase the supply of VW shares by borrowing shares to sell. Porsche induced the Plaintiffs to borrow VW shares and short them, undertaking an obligation to repurchase the shares and return them at a future date. Porsche then bought call options from its counterparties, and Porsche's counterparties bought the shares that Plaintiffs' were selling short to hedge the call options they sold Porsche. The shares hedging all of the call options that Porsche's counterparties sold to Porsche sat available for delivery to Porsche on exercise. Put simply, Porsche targeted short sellers in order to amass a position in VW shares that it could not have amassed on the open market without the Plaintiffs' short selling.

22. As a result, by October 26, 2008, almost nobody owned VW shares except for Porsche, Lower Saxony, index-tracking funds that were required to hold the VW shares to mimic indices, and Porsche's counterparties (*i.e.*, investment banks) that were holding VW shares to hedge the call options they sold Porsche. Porsche's fraud and manipulation masked the fact that

what appeared to the market (including Plaintiffs) to be a large free float of VW shares was nothing of the kind.

23. At the time of Porsche's announcement of the true extent of its control of VW shares and its true intentions with respect to VW, the short interest in VW was about 13%.[4] Porsche knew it had acquired control of 74.1% of VW's shares. Porsche also knew that Lower Saxony held 20% of VW's shares. Since 74.1% plus 20% equals 94.1%, and since some significant part (perhaps all) of the remaining 5.9% (*i.e.*, 100% minus 94.1%) was tied up with investors that would not sell (notably, index funds), this meant that a free float significantly below 5.9% was all that existed to satisfy a short interest of 13%. A price spike of unknowable magnitude was inevitable and foreseeable to Porsche.

24. Porsche's announcement that it had become "apparent that there were considerably more short positions in the market than expected" was a pretext for another reason. Porsche did not make its announcement to accommodate short sellers; Porsche made its announcement because Porsche needed the price to spike up to save its own skin. Porsche's share acquisition strategy – selling put options to finance the purchase of call options – had left it dangerously exposed to declines in the value of VW shares, and the price of VW shares had begun to decline in the week before the massive short squeeze.

25. Porsche had acquired control over virtually the entire free float of VW shares by entering into derivatives contracts. On a conference call with Porsche investors on October 2, 2007, Gaube referred to Haerter as the "mastermind" behind all options strategies related to the VW ownership stake. Haerter, according to Gaube, was a specialist in the derivatives markets and in the mathematics of options and other derivatives.

---

[4] The "short interest" in a stock is the percentage of that stock that has been sold short.

26.     Porsche used a strategy combining "call" options and "put" options. Call options increase in value as the price of the underlying stock – here, the price of VW shares – rises. Because Porsche's counterparties would hedge the call options by buying VW shares, and would give those shares to Porsche at settlement of the call options, it was the call option part of Porsche's strategy that led most directly to control of the VW shares. But call options cost money, and Porsche did not have the cash to buy all of the call options it needed to obtain control of VW. Instead, Porsche paid for its call options by selling put options. Put options obligated Porsche to pay its put option counterparties the difference between the "strike" price of the put option and the actual price of VW shares, if the put strike price was higher than the actual price. For example, if Porsche had previously sold a put option on VW shares to a counterparty with a strike price of €220 and the price of VW shares was at €270, Porsche would not owe the counterparty anything because the strike price of €220 was below the share price of €270. But if the price of VW shares fell below €220, to, say, €210, then Porsche would owe the counterparty €10, the difference between €220 and €210. In general, if the price of VW shares dropped below the put strike price, then Porsche had a liability to its counterparties for that difference, and as the price of VW shares fell, that liability increased.

27.     Selling put options was the only way that Porsche could afford to amass the huge position in call options that it announced on October 26, 2008. In essence, Porsche sold put options – which obligated it to pay money if the price of VW shares declined – in exchange for call options by which Porsche accumulated control of VW shares if the price increased. This strategy would work so long – and only so long – as the price of VW shares kept rising. A rising share price generated gains on the value of its call options (what counterparties owed Porsche)

and reduced Porsche's liabilities on the value of the put options (what Porsche owed counterparties).

28. For months, Porsche remained both relatively unconcerned about its liability on its put contracts and assured of its control over VW shares because the price of VW shares kept increasing. For example, on March 3, 2008, VW shares closed at just under €150. On August 8, 2008, VW shares closed just over €200. On September 18, 2008, VW shares closed over €300 for the first time. The average closing price of VW shares from October 1, 2008 through October 17, 2008 (a Friday), was over €321. The viability of Porsche's strategy depended on VW's share price rising over time. The rising VW share price induced additional short selling and reduced Porsche's liabilities on its put options. At the same time, Porsche could not afford for the VW share price to jump so high that the price would accurately reflect Porsche's desire to acquire more shares and the risk of a short squeeze. In sum, Porsche's strategy involved a constant balancing act, an act that Porsche managed to pull off through mid-October 2008 by carefully feeding inaccurate information to the marketplace.

29. But on Monday, October 20, 2008, Porsche's strategy began to unravel. The price of VW shares finally began to fall with the rest of the world's stock markets. VW shares closed at €277 that day, more than 22% below its close the previous Friday. By Friday, October 24, 2008, the closing price of VW shares had fallen to just under €211, or 34% below the average closing price of €321 from October 1, 2008, through October 17, 2008, and more than 40% below the closing price of €358 on Friday, October 17, 2008. The decline in the price threatened to bankrupt Porsche, because Porsche's increasing liability on its put options would overwhelm the falling value of Porsche's call options. Porsche had to increase the price of VW and chose to do so by setting the short squeeze in motion.

30. On October 26, 2008, a Sunday, Porsche revealed its true control: it said that "[a]t the end of last week, Porsche SE held 42.6 percent of the Volkswagen ordinary shares and in addition 31.5 percent in so called cash settled options relating to Volkswagen ordinary shares to hedge against price risks, representing a total of 74.1%." Never before had Porsche disclosed the true extent of its options, or admitted that the options should be added to the shares it owned outright to calculate its "total" stake. Porsche's representation of a "total" of "74.1%" confirms that Porsche viewed its options and its understandings with its counterparties as giving it control of the VW shares underlying the options. Porsche also admitted it aimed "to increase to 75% in 2009, paving the way to a domination agreement," putting the lie to its statement just weeks earlier that domination was "totally unrealistic."

31. The *Wall Street Journal* reported on events immediately following Porsche's October 26, 2008 announcement:

> When financial markets opened Monday, October 27, all hell broke loose. Funds that had borrowed VW shares and sold them, expecting no takeover offer and betting the stock would decline, raced to purchase shares to unwind the bets. There weren't enough to go around. Part of the reason is that underwriters of cash-settled options typically hedge their risk by owning the shares of the company involved. The shares they owned, combined with those Porsche had acquired, added up to 74.1%, and Lower Saxony state owned 20.1%. The result was that while some 12.8% of VW shares were on loan, mostly to short sellers, those that for practical purposes were in circulation amounted to only 6% of VW shares. As hedge funds fought for the remaining VW shares, they drove the stock's price ever higher—deepening their losses. At the height of the short squeeze on Oct. 28, VW stock briefly topped 1,000 Euros, nearly five times as high as on Oct. 24, making VW the biggest company by stock-market value for a few hours.

Mike Esterl and Edward Taylor, "As Giant Rivals Stall, Porsche Engineers a Financial Windfall," *Wall Street Journal*, A1, November 8, 2008.

32.     On Monday, October 27, 2008, VW shares opened at €350 per share, up 66% from the close on Friday, October 24, 2008. During the week of October 27-31, 2008, VW shares traded between a low of €324.99 (54% above the close on Friday, October 24, 2008) to a high of €1,005.01 (477% above the close on Friday, October 24, 2008), and, for a time, Volkswagen was the most valuable corporation on the planet by market capitalization given the short squeeze prices prevailing in the market. Plaintiffs were forced to cover their short positions at prices that spiraled higher and higher. Porsche was no mere bystander while this happened. Porsche released billions of Euros worth of its VW shares into the short squeeze for its own profit. By releasing some of its own positions, Porsche was able to skim off outrageous and illegal profits while still maintaining the bulk of its position for the takeover of VW. Upon information and belief, Porsche also reduced its exposure to the put options it had sold.

33.     As Plaintiffs weathered the short squeeze in the last days of October and into November 2008, a Porsche representative mocked them, saying, "A couple of gamblers on the market got their odds wrong. And now they are pointing a finger at us." But Defendants stacked the deck and loaded the dice. No Plaintiff would have sold VW shares short had it known that Porsche was cornering the market in VW shares (1) with false denials of its intent to take over VW and (2) by engaging in a series of manipulative derivatives trades to hide the extent to which Porsche controlled VW shares.

## PARTIES

**Plaintiffs**

34.     Elliott Associates, L.P. is a Delaware limited partnership with its principal address at 712 Fifth Avenue, 36th Floor, New York, New York 10019. Elliott Management Corporation in New York, New York, at all relevant times, provided services to Elliott Associates, L.P., and personnel at Elliott Management Corporation had authority over its VW-related investment decisions.

35.     Elliott International, L.P. is a Cayman Islands limited partnership with its registered address at c/o Maples & Calder, P.O. Box 309, Ugland House, South Church Street, George Town, Cayman Islands. Elliott Management Corporation in New York, New York, at all relevant times, provided services to Elliott International Capital Advisers, Inc., the investment manager of Elliott International, L.P., and personnel at Elliott Management Corporation had authority over its VW-related investment decisions.

36.     The Liverpool Limited Partnership is a Bermuda limited partnership with its registered address at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda. Elliott Management Corporation in New York, New York, at all relevant times, provided services to The Liverpool Limited Partnership, and personnel at Elliott Management Corporation had authority over its VW-related investment decisions.

37.     Canyon Capital Arbitrage Master Fund, Ltd., is a Cayman Islands company with its principal address at c/o Ogier Fiduciary Services (Cayman) Limited, 89 Nexus Way, Camana Bay, Grand Cayman, KY1-9007 Cayman Islands. Canyon Capital Advisors LLC in Los Angeles, California, at all relevant times, managed Canyon Capital Arbitrage Master Fund, Ltd., and made its VW-related investment decisions.

38. Canyon Balanced Master Fund, Ltd. is a Cayman Islands company with its principal address at c/o Ogier Fiduciary Services (Cayman) Limited, 89 Nexus Way, Camana Bay, Grand Cayman, KY1-9007 Cayman Islands. Canyon Capital Advisors LLC in Los Angeles, California, at all relevant times, managed Canyon Balanced Master Fund, Ltd., and made its VW-related investment decisions.

39. The Canyon Value Realization Fund (Cayman), Ltd., is a Cayman Islands company with its principal address at c/o Ogier Fiduciary Services (Cayman) Limited, 89 Nexus Way, Camana Bay, Grand Cayman, KY1-9007 Cayman Islands. Canyon Capital Advisors LLC in Los Angeles, California, at all relevant times, managed The Canyon Value Realization Fund (Cayman), Ltd., and made its VW-related investment decisions.

40. Canyon Value Realization Fund, L.P., is a Delaware limited partnership with its principal address at 2000 Avenue of the Stars, 11th Floor, Los Angeles, CA 90067. Canyon Capital Advisors LLC in Los Angeles, California, at all relevant times, managed Canyon Value Realization Fund, L.P., and made its VW-related investment decisions.

41. D. E. Shaw Valence International, Inc. is a British Virgin Islands international business company with its registered address at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. D. E. Shaw & Co., L.P. in New York, New York, at all relevant times, was the managing member of D. E. Shaw Valence Portfolios, L.L.C., the sole shareholder of D. E. Shaw Valence International, Inc., and personnel at D. E. Shaw & Co., L.P. made the VW-related investment decisions for D. E. Shaw Valence International, Inc.

42. Glenhill Capital LP is a Delaware limited partnership with its principal address at 156 West 56th Street, 17th Floor, New York, New York 10019. Glenhill Capital Management

LLC in New York, New York, at all relevant times, managed Glenhill Capital LP, and made its VW-related investment decisions.

43. Glenhill Capital Overseas Master Fund LP is a Cayman Islands limited partnership with its principal address at Goldman Sachs (Cayman) Trust Limited, P.O. Box 896 KY1-1103, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands. Glenhill Capital Management LLC in New York, New York, at all relevant times, managed Glenhill Capital Overseas Master Fund LP, and made its VW-related investment decisions.

44. Glenhill Concentrated Fund L.P. is a Delaware limited partnership with its principal address at 156 West 56th Street, 17th Floor, New York, New York 10019. Glenhill Capital Management LLC in New York, New York, at all relevant times, managed Glenhill Concentrated Fund, L.P., and made its VW-related investment decisions.

45. Glenview Capital Partners, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153. Glenview Capital Management, LLC in New York, New York, at all relevant times, managed Glenview Capital Partners, L.P., and made its VW-related investment decisions.

46. Glenview Institutional Partners, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153. Glenview Capital Management, LLC in New York, New York, at all relevant times, managed Glenview Institutional Partners, L.P., and made its VW-related investment decisions.

47. Glenview Capital Master Fund, Ltd. is a Cayman Islands company with its principal address at Goldman Sachs (Cayman) Trust Limited, P.O. Box 896 KY1-1103, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands. Glenview Capital