Management, LLC in New York, New York, at all relevant times, managed Glenview Capital Master Fund, Ltd., and made its VW-related investment decisions.

48.    GCM Little Arbor Partners, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153.  Glenview Capital Management, LLC in New York, New York, at all relevant times, managed GCM Little Arbor Partners, L.P., and made its VW-related investment decisions.

49.    GCM Little Arbor Institutional Partners, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153. Glenview Capital Management, LLC in New York, New York, at all relevant times, managed GCM Little Arbor Institutional Partners, L.P., and made its VW-related investment decisions.

50.    GCM Little Arbor Master Fund, Ltd. is a Cayman Islands company with its principal address at Goldman Sachs (Cayman) Trust Limited, Goldman Sachs (Cayman) Trust Limited, P.O. Box 896 KY1-1103, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands.  Glenview Capital Management, LLC in New York, New York, at all relevant times, managed GCM Little Arbor Master Fund, Ltd., and made its VW-related investment decisions.

51.    GCM Opportunity Fund, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153. Glenview Capital Management, LLC in New York, New York, at all relevant times, managed GCM Opportunity Fund, L.P., and made its VW-related investment decisions.

52.    Glenview Capital Opportunity Fund, L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, 44th Floor, New York, New York 10153.  Glenview

Capital Management, LLC in New York, New York, at all relevant times, managed Glenview Capital Opportunity Fund, L.P., and made its VW-related investment decisions.

53.    Glenview Offshore Opportunity Master Fund, Ltd. is a Cayman Islands company with its principal address at Goldman Sachs (Cayman) Trust Limited, Goldman Sachs (Cayman) Trust Limited, P.O. Box 896 KY1-1103, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands.  Glenview Capital Management, LLC in New York, New York, at all relevant times, managed Glenview Offshore Opportunity Master Fund, Ltd., and made its VW-related investment decisions.

54.    Greenlight Capital, L.P. is a Delaware limited partnership with its principal address at 140 East 45th Street, 24th Floor, New York, New York 10017.  Greenlight Capital, LLC, in New York, New York, at all relevant times managed Greenlight Capital, L.P., and made its VW-related investment decisions.

55.    Greenlight Capital Qualified, L.P. is a Delaware limited partnership with its principal address at 140 East 45th Street, 24th Floor, New York, New York 10017.  Greenlight Capital, LLC, in New York, New York, at all relevant times managed Greenlight Capital Qualified, L.P., and made its VW-related investment decisions.

56.    Greenlight Capital Offshore Partners is a British Virgin Islands partnership with its principal address c/o Citco B.V.I. Limited, P.O. Box 662, Road Town, Tortola, British Virgin Islands.  Greenlight Capital Offshore Partners is the successor in interest to Greenlight Capital Offshore, Ltd., a British Virgin Islands company, that held the relevant VW-related investments. Greenlight Capital, Inc., in New York, New York, at all relevant times managed Greenlight Capital Offshore, Ltd., and made its VW-related investment decisions.

57.    Greenlight Reinsurance, Ltd. is a Cayman Islands company with its principal address at 65 Market Street, Suite 1207, Jasmine Court, Camana Bay, P.O. Box 31110, Grand Cayman KY1-1205, Cayman Islands.  DME Advisors, LP, at 140 East 45th Street, 24th Floor, New York, New York 10017, at all relevant times managed Greenlight Reinsurance, Ltd.'s investments, and made its VW-related investment decisions.

58.    Ironbound Partners LP is a Delaware limited partnership with its principal address at 902 Carnegie Center, Suite 300, Princeton, New Jersey 08540.  Ironbound Capital Management LP in Princeton, New Jersey, at all relevant times, managed Ironbound Partners LP, and made its VW-related investment decisions.

59.    Ironbound Partners Overseas Ltd. is a Cayman Islands company with its registered office located at the offices of Goldman Sachs (Cayman) Trust, Limited, P.O. Box 896, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands.  Ironbound Capital Management LP in Princeton, New Jersey, at all relevant times, managed Ironbound Partners Overseas Ltd., and made its VW-related investment decisions.

60.    Perry Partners L.P. is a Delaware limited partnership with its principal address at 767 Fifth Avenue, New York, New York 10153.  Perry Corp. in New York, New York, at all relevant times, managed Perry Partners L.P., and made its VW-related investment decisions.

61.    Perry Partners International, Inc. is a British Virgin Islands corporation with its principal address at Citco Fund Services (Cayman Islands) Limited, Windward 1, Regatta Office Park, West Bay Road, P.O. Box 31106, Grand Cayman KY1-1205, Cayman Islands.  Perry Corp. in New York, New York, at all relevant times, managed Perry Partners International, Inc., and made its VW-related investment decisions.

62.    Royal Capital Value Fund, LP is a Delaware limited partnership with its principal address at 623 Fifth Ave., 24th Floor, New York, New York. Royal Capital Management LLC in New York, New York, at all relevant times, managed Royal Capital Value Fund, LP and made its VW-related investment decisions.

63.    Royal Capital Value Fund (QP), LP is a Delaware limited partnership with its principal address at 623 Fifth Ave., 24th Floor, New York, New York. Royal Capital Management LLC in New York, New York, at all relevant times, managed Royal Capital Value Fund (QP), LP and made its VW-related investment decisions.

64.    RoyalCap Value Fund, Ltd. is a Cayman Islands company with its principal address at Goldman Sachs (Cayman) Trust Limited, P.O. Box 896 KY1-1103, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands. Royal Capital Management LLC in New York, New York, at all relevant times, managed RoyalCap Value Fund, Ltd. and made its VW-related investment decisions.

65.    RoyalCap Value Fund II, Ltd. is a Cayman Islands exempted company with its principal address at Goldman Sachs (Cayman) Trust Limited, P.O. Box 896 KY1-1103, Gardenia Court, Suite 3307, 45 Market Street, Camana Bay, Cayman Islands. Royal Capital Management LLC in New York, New York, at all relevant times, managed RoyalCap Value Fund II, Ltd. and made its VW-related investment decisions.

66.    Tiger Global, L.P. is a Delaware limited partnership with its principal address at 101 Park Avenue, 48th Floor, New York, New York 10178. Tiger Global Management, LLC, in New York, New York, at all relevant times, managed Tiger Global, L.P. and made its VW-related investment decisions.

24

67.    Tiger Global II, L.P. is a Delaware limited partnership with its principal address at 101 Park Avenue, 48th Floor, New York, New York 10178.  Tiger Global Management, LLC, in New York, New York, at all relevant times, managed Tiger Global II, L.P. and made its VW-related investment decisions.

68.    Tiger Global, Ltd. is a Cayman Islands company with its principal address at c/o Citco Fund Services (Curacao) N.V., Kaya Flamboyan 9, P.O. Box 4774, Willemstad, Curacao, Netherlands Antilles.  Tiger Global Management, LLC, in New York, New York, at all relevant times, managed Tiger Global, Ltd. and made its VW-related investment decisions.

**Defendants**

69.    Until November 13, 2007, Porsche Automobil Holding SE was known as Dr. Ing. h.c. F. Porsche Aktiengesellschaft.   On November 13, 2007, Dr. Ing. h.c. F. Porsche Aktiengesellschaft became a European stock corporation (Societas Europaea) and was renamed Porsche Automobil Holding SE.

70.    Wiedeking was, at all relevant times, President and Chief Executive Officer of Porsche.

71.    Haerter was, at all relevant times, Vice President of Finance for Porsche.

72.    The gains to Porsche from its scheme flowed directly into the pockets of Defendants Wiedeking and Haerter, whose outsized compensations depended on Porsche's profitability.  Porsche reportedly paid Wiedeking an estimated $113 million in 2008.  Porsche reportedly paid Haerter an estimated $44 million in 2008.

## SUBJECT-MATTER JURISDICTION

73.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and under §27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa, because certain of Plaintiffs' claims arise under §10(b) and §20(a) of the Exchange Act.

74.    This Court has supplemental jurisdiction over Plaintiffs' state-law fraud claims pursuant to 28 U.S.C. §1367.

## PERSONAL JURISDICTION

75.    This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(2), as well as under §27 of the Exchange Act, 15 U.S.C. §78aa, each of which extends personal jurisdiction to the limit of the Fifth Amendment's Due Process Clause.

### General Jurisdiction

76.    The following facts demonstrate that Porsche has substantial, persistent contacts with the United States that make it generally amenable to suit in a United States court:

a.    The United States is the largest market for Porsche automobiles.

b.    Porsche reported that in 2005 it sold over 33,000 automobiles in the United States and Canada, 36,000 each in 2006 and 2007, and 27,000 in 2008.

c.    Porsche does extensive business in the United States through its agent, Porsche Automobiles North America, Inc., a Delaware corporation wholly-owned by Porsche through its subsidiary, with its principal place of business in Atlanta, Georgia.

d.    Porsche Automobiles North America performs substantial business activity on behalf of Porsche that, were it not for Porsche Automobiles North America, Porsche would perform itself.

e. Porsche has an American Depositary Receipt ("ADR") that trades over the counter in the United States. An ADR is a U.S. dollar denominated form of equity ownership in a non-U.S. company. It represents the foreign shares of the company held on deposit by a custodian bank in the company's home country and carries the corporate and economic rights of the foreign shares, subject to the terms specified in the ADR certificate.

f. By 17 C.F.R. §240.12g3-2, the SEC exempts foreign issuers such as Porsche from the gamut of ordinary securities registration requirements—permitting the trading of ADRs—only if the issuer complies with certain regulations.

g. Porsche complies with the SEC's regulation of ADRs by providing English-language versions of its financial disclosures. See 17 C.F.R. §240.12g3-2(b)(1)(iii).

h. Porsche knows that United States investors will reasonably rely on this information.

i. Defendants Wiedeking and Haerter were actively involved in managing Porsche's business interests in the United States. Wiedeking was a member of the boards of directors of Porsche Cars North America, Inc., and Porsche Enterprises Inc., each a Delaware corporation wholly-owned by Porsche through its subsidiary. Haerter was a member of the boards of directors of Porsche Cars North America, Inc., Porsche Enterprises, Inc., and Porsche Financial Services Inc., each a Delaware corporation wholly-owned by Porsche through its subsidiary.

27

77.    As persons who controlled Porsche's fraudulent misstatements between March and October 2008, and as the direct source of many of those misstatements, Defendants Wiedeking and Haerter are responsible for Porsche's wrongdoing in, and directed toward, the United States.

**Specific Jurisdiction**

78.    The following facts demonstrate that Porsche had sufficient minimum contacts with the United States to render it amenable to this suit.  In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, interstate wire and telephone communications.

79.    As more fully described in this Complaint, Defendants' acts and conduct occurred in the United States, were directed at investors and investment managers in the United States, and had substantial, direct and foreseeable effects on Plaintiffs and other persons in the United States.

80.    Upon information and belief, Porsche began its efforts to acquire VW by purchasing a large block of VW shares from Brandes Investment Partners LLC, an American institutional investor in San Diego, California.

81.    It was Porsche's practice to distribute press releases, announcements, and other significant company news or documents by email, in English, to an undisclosed distribution list. Names of the distribution list's recipients appeared, however, in an email on June 26, 2007.  That email revealed at least 30 recipients in the United States.  The U.S. recipients were individuals at hedge funds, investment funds, and pension funds.

82.     Upon information and belief, Porsche used a substantially similar distribution list whenever it emailed press releases, announcements, and other significant company information.

83.     The following are examples of emails Porsche is believed to have sent into the United States:

a.  On November 14, 2006, Sylvia Stadelmann ("Stadelmann") of Porsche emailed an invitation to Porsche's analyst conference in Stuttgart.

b.  On March 5, 2007, Stadelmann emailed the Porsche Group Shareholders' Letter, which discussed Porsche's investment in VW.

c.  On March 24, 2007, Gaube emailed an announcement of the decision by the Supervisory Board of Porsche to authorize an increase in Porsche's stake in VW from 27.3% to up to 31% and disclosed that Porsche held an option to purchase up to 3.7% of VW's shares.

d.  On April 30, 2007, Gaube emailed a notice that Porsche had just published a mandatory offer for VW shares on its website and a link directing recipients of the email to Porsche's offer.

e.  On May 4, 2007, Gaube emailed an invitation to Porsche's extraordinary general meeting.

f.  On May 7, 2007, Gaube emailed a notice that Porsche had just published the results of the first week of Porsche's mandatory offer for VW shares.

g.  On May 30, 2007, Gaube emailed a notice of the expiration of Porsche's mandatory offer for VW shares.

h.  On June 4, 2007, Gaube emailed a press release announcing the results of Porsche's mandatory offer for VW shares.

i.  On June 26, 2007, Gaube emailed a press release discussing Porsche's investment in VW.

j.  On October 23, 2007, Stadelmann emailed a Porsche press release discussing a decision by the European Court of Justice regarding the VW Law.

k.  On December 14, 2007, Gaube emailed Porsche's interim financial information, which contained a discussion of Porsche's "strategic/industrial" partnership with VW.

l.  On March 3, 2008, Katharina Dippell ("Dippell") of Porsche emailed a press release announcing the decision of the Supervisory Board of Porsche to authorize the increase of Porsche's stake in VW to more than 50%.

m.  On March 10, 2008, Dippell emailed a press release in which Porsche stated that it would not seek to raise its stake in VW to 75%.

n.  On March 14, 2008, Dippell emailed a press release in which Porsche said it would seek to amend VW's articles of association to reflect the judgment of the European Court of Justice regarding the VW Law.

o.  On March 19, 2008, Dippell emailed Porsche's half-year financial report, which discussed Porsche's investment in VW, the VW Law, and Porsche's intentions going forward, stating that once "antitrust clearance has been given, Porsche SE will acquire the majority shareholding in Volkswagen, with a view to creating one of the world's most innovative and efficient automotive alliances...."

p.  On April 18, 2008, Dippell emailed a transcript of a magazine interview of Wolfgang Porsche and Ferdinand Piëch, members of the two families that

control much of Porsche and VW, in which they discussed Porsche's investment in VW.

q. On June 18, 2008, Stadelmann emailed Porsche's interim financial information, which discussed Porsche's investment in VW, the VW Law, Porsche's intention to acquire the "majority of voting rights" in VW, and Porsche's intent to create "one of the world's most innovative and efficient automotive alliances...."

r. On October 27, 2008, Gaube emailed the October 26, 2008, press release in which Porsche finally revealed its intention to go to 75% of VW shares and to seek a domination agreement with VW, which helped lead to the short squeeze in VW shares.

84.    Porsche also distributed information regarding Porsche's investment in VW by participating in telephone conversations with investors in the United States:

a. On May 5, 2008, Gaube spoke by telephone to Keith Goodman, an analyst at Glenhill in New York. Upon information and belief, Gaube knew Goodman was in New York at the time of the phone call. Goodman was an analyst responsible for helping Plaintiffs Glenhill Capital LP, Glenhill Capital Overseas Master Fund LP, and Glenhill Concentrated Fund LP decide what positions to take in the market. During the telephone call, Gaube told Goodman that Porsche wanted to get to more than 50% ownership in VW shares and, toward that goal, had used options to lock up 20% of VW shares, in addition to the approximately 31% it already owned outright. Gaube told Goodman that Porsche had no intention of increasing its stake in VW to 75%.

b.  On October 20, 2008, Gaube spoke by telephone with David Einhorn, who was in New York. Upon information and belief, Gaube knew Einhorn was in New York at the time of the phone call. Einhorn had final authority to make all trading decisions for Plaintiffs Greenlight Capital, L.P., Greenlight Capital Qualified, L.P., Greenlight Capital Offshore Partners, and Greenlight Reinsurance, Ltd.  Gaube told Einhorn that Porsche was not going to 75%, that "going to 75% is not on the agenda," and specifically denied controlling almost all the float of VW shares. Gaube also expressly disavowed the speculation of one analyst, Max Warburton of Alliance Bernstein, who, on October 17, 2008, had offered in the form of a Bernstein Research analyst report a seemingly speculative argument that Porsche might be accumulating additional control of VW shares.  Gaube claimed to have "talked to a number of investors and analysts" to refute Warburton's theory, which Gaube called "complete bullshit."

c.  On or about October 20, 2008, Gaube spoke by telephone with Tiger Global's Neeraj Chandra, who was in New York. Upon information and belief, Gaube knew Chandra was in New York at the time of the phone call. Chandra was an analyst responsible for helping Plaintiffs Tiger Global, L.P.; Tiger Global II, L.P.; and Tiger Global, Ltd. decide what positions to take in the market. Gaube told Chandra that Porsche had options that would allow it to go take its stake in VW shares to 50-55%, but told Chandra that the accumulation would stop there.

    d.  On October 22, 2008, Gaube spoke by telephone with Glenview's CEO, Larry Robbins, who was in New York. Upon information and belief, Gaube knew that Robbins was in New York at the time of the phone call. Robbins had final authority to make all trading decisions for Plaintiffs Glenview Capital Partners, L.P., Glenview Institutional Partners, L.P., Glenview Capital Master Fund, Ltd., GCM Little Arbor Partners, L.P., GCM Little Arbor Institutional Partners, L.P., GCM Little Arbor Master Fund, Ltd., GCM Opportunity Fund, L.P., Glenview Capital Opportunity Fund, L.P., and Glenview Offshore Opportunity Master Fund, Ltd. During the telephone call, Gaube told Robbins that Porsche did not intend to go much above 51% ownership in VW and did not intend to go to 75%.

85.    Defendants made other statements related to their VW investment while they were in the United States:

    a.  On October 12, 2005, Defendant Haerter spoke on Porsche's behalf at the St. Regis Hotel in New York with American investors about Porsche's investment in VW. Merrill Lynch's New York office sponsored this meeting between Porsche and American investors. Porsche's American meeting was part of a road show about which the *Financial Times* reported on October 2, 2005: "Conscious of the market's skepticism, Porsche will from this week meet UK and US investors to try to convince them of the merits of its plan."

    b.  On January 9, 2007, at the North American International Auto Show in Detroit, Defendant Wiedeking met with reporters in a conference room inside

Detroit's Cobo Center.  Of the 69 questions posed to Wiedeking during an hour-long group interview, 64 pertained to VW.

c. On January 10, 2007, *Business Week* reported an interview between its Detroit correspondent David Kiley and Defendant Wiedeking that took place at the auto show in Detroit.  Kiley asked Wiedeking why Porsche was not paying a premium for control of VW.  Wiedeking responded, "Why should I pay a premium?  No.  I don't see any reason for this, 29% is enough for Porsche. We won't acquire more than 50%."

86.    At all relevant times, Porsche maintained an English language website with an archive of English language press releases.    Porsche used this website to target its misrepresentations at U.S. investors.  Porsche did not translate all of its press releases into English, but it did translate all of them that related to Porsche's intentions and positions with respect to VW.  Furthermore, U.S. investors visiting Porsche's U.S. website were directed to Porsche's English language website to obtain investor relations information.

87.    Defendants' wrongful conduct had a substantial effect in the United States and upon United States residents, including Plaintiffs.

88.    Plaintiffs' investment decisions relating to their VW investments were made primarily by U.S. companies located in New York, New York, that contracted to manage Plaintiffs' investments.

89.    As set forth below, in October 2008, the Plaintiffs had a significant percentage of U.S. investors, in many cases 100%:

a.   Approximately 95% of the investors in Elliott Associates, L.P. were located in the United States.  Those U.S. investors owned approximately 95% of Elliott Associates, L.P.

b.   Elliott International, L.P. had one investor: Elliott International Limited, a Cayman Islands limited company.  Approximately 80% of the investors in Elliott International Limited were located in the United States.  Those U.S. investors owned approximately 70% of Elliott International Limited.  Elliott International Limited invested substantially all of its assets in Elliott International, L.P.

c.   The Liverpool Limited Partnership had one investor: Elliott Associates, L.P. Approximately 95% of the investors in Elliott Associates, L.P. were located in the United States.  Those U.S. investors owned approximately 95% of Elliott Associates, L.P.

d.   Approximately 89% of the investors in Canyon Capital Arbitrage Master Fund, Ltd. were located in the United States.  Those U.S. investors owned approximately 89% of Canyon Capital Arbitrage Master Fund, Ltd.

e.   Approximately 84% of the investors in Canyon Balanced Master Fund, Ltd. were located in the United States.  Those U.S. investors owned approximately 53% of Canyon Balanced Master Fund, Ltd.

f.   Approximately 38% of the investors in The Canyon Value Realization Fund (Cayman), Ltd. were located in the United States.  Those U.S. investors owned approximately 27% of The Canyon Value Realization Fund (Cayman), Ltd.

g.  Approximately 99% of the investors in Canyon Value Realization Fund, L.P. were located in the United States.  Those U.S. investors owned approximately 97% of Canyon Value Realization Fund, L.P.

h.  D. E. Shaw Valence International, Inc. had one shareholder: D. E. Shaw Valence Portfolios, L.L.C., a Delaware limited liability company.  D. E. Shaw Valence Portfolios, L.L.C. was approximately 100% owned by D. E. Shaw Composite Portfolios, L.L.C., a Delaware limited liability company, which in turn was approximately 26% owned by D. E. Shaw Composite Fund, L.L.C. (a Delaware limited liability company) and approximately 74% owned by D. E. Shaw Composite Holdings, L.L.C., which is approximately 100% owned by D. E. Shaw Composite International Fund (a Cayman Islands capital account trust).  Approximately 93% of the investors in D. E. Shaw Composite Fund, L.L.C. were located in the United States.  Those U.S. investors owned approximately 94% of D. E. Shaw Composite Fund, L.L.C. Approximately 12% of the investors in D. E. Shaw Composite International Fund were located in the United States.  Those investors owned approximately 10% of D. E. Shaw Composite International Fund.

i.  100% of the investors in Glenhill Capital LP were located in the United States.

j.  Approximately 99% of the investors in Glenhill Capital Overseas Master Fund LP were located in the United States.  Those U.S. investors owned approximately 99% of Glenhill Capital Overseas Master Fund LP.

k.  100% of the investors in Glenhill Concentrated Fund LP were located in the United States.

l.  All of the investors in Glenview Capital Partners, L.P. were located in the United States.

m.  Approximately 99% of the investors in Glenview Institutional Partners, L.P. were located in the United States.  Those U.S. investors owned approximately 85% of Glenview Institutional Partners, L.P.

n.  Approximately 28% of the investors in Glenview Capital Master Fund, Ltd. were located in the United States.  Those U.S. investors owned approximately 10% of Glenview Capital Master Fund, Ltd.

o.  All of the investors in GCM Little Arbor Partners, L.P. were located in the United States.

p.  All of the investors in GCM Little Arbor Institutional Partners, L.P. were located in the United States.

q.  Approximately 31% of the investors in GCM Little Arbor Master Fund, Ltd. were located in the United States.  Those U.S. investors owned approximately 24% of GCM Little Arbor Master Fund, Ltd.

r.  All of the investors in GCM Opportunity Fund, L.P. were located in the United States.

s.  All of the investors in Glenview Capital Opportunity Fund, L.P. were located in the United States.

t.  Approximately 24% of investors in Glenview Offshore Opportunity Master Fund, Ltd. were located in the United States. Those U.S. investors owned approximately 48% of Glenview Offshore Opportunity Master Fund, Ltd.

u.  All of the investors in Greenlight Capital, LP were located in the United States.

v.  Approximately 99% of the investors in Greenlight Capital Qualified, LP were located in the United States.

w.  Greenlight Capital Offshore Partners is the successor in interest to Greenlight Capital Offshore, Ltd., a British Virgin Islands company, that held the relevant VW-related investments. During the relevant time, approximately 43% of the investors in Greenlight Capital Offshore, Ltd. were located in the United States. Those U.S. investors owned approximately 29% of Greenlight Capital Offshore, Ltd.

x.  Greenlight Reinsurance, Ltd. is a wholly owned subsidiary of Greenlight Capital Re, Ltd., a Cayman Islands company that is a publicly traded company registered in the United States. At all relevant times, Greenlight Capital Re, Ltd. believes, upon information and belief, that a majority of its shareholders were located in the United States.

y.  All of the investors in Ironbound Partners LP were located in the United States.

z.  Approximately 53% of the investors in Ironbound Partners Overseas Ltd. were located in the United States. Those U.S. investors owned approximately 89% of Ironbound Partners Overseas Ltd.

aa. Approximately 98% of the investors in Perry Partners L.P. were located in the United States.  Those U.S. investors owned approximately 99% of Perry Partners L.P.

bb. Approximately 41% of the investors in Perry Partners International, Inc. were located in the United States.  Those U.S. investors owned approximately 42% of Perry Partners International, Inc.

cc. All of the investors in Royal Capital Value Fund, LP were located in the United States.

dd. Approximately 98% of the investors in Royal Capital Value Fund (QP), LP were located in the United States.  Those U.S. investors owned approximately 95% of Royal Capital Value Fund (QP), LP.

ee. Approximately 43% of the investors in RoyalCap Value Fund, Ltd. were located in the United States.  Those U.S. investors owned approximately 23% of RoyalCap Value Fund, Ltd.

ff. 100% of the investors in Tiger Global, L.P. were located in the United States.

gg. 100% of the investors in Tiger Global II, L.P. were located in the United States.

hh. Approximately 63% of the investors in Tiger Global, Ltd. were located in the United States.  Those U.S. investors owned approximately 51% of Tiger Global, Ltd.

90.    As evidenced by Porsche's statements on October 26, 2008, Defendants knew that the primary victims of their scheme would be hedge funds that took short positions in VW shares.  As explained above, Porsche's fraudulent strategy deliberately targeted hedge funds that

39

would enter into short positions.   In order to secretly obtain 75 percent ownership in VW, Porsche needed short sellers to borrow stock from current owners who would not or could not sell the stock themselves and then to sell it to Porsche or Porsche's call option counterparties. Without the additional supply created by short sellers, Porsche could never have achieved 75 percent ownership in VW shares.

91.     Upon information and belief, Defendants knew that hedge funds and the managers who make their investment decisions are concentrated in a small number of locations, with the large majority of investment managers based in and around New York, New York.   Therefore, upon information and belief, Defendants (a) needed to affect investment decisions in the United States to pull off their plan and (b) knew that American-based investment managers would rely, in the United States, on Defendants' fraudulent misstatements—and that the hedge funds they advised would be the primary victims of Defendants' fraud and manipulation.

92.     While VW shares traded on European exchanges, U.S. investors were far more important owners of VW shares than were German institutional investors.   In its 2004 Annual Report, VW reported:

> As the largest single shareholder, the State of Lower Saxony held 18.2% of the ordinary shares. ... A further tranche of shares is held by investment consultant Brandes Investment Partners, LCC [sic], San Diego, California, USA, which notified Volkswagen AG on July 28, 2004 that the total proportion of ordinary shares held by its clients amounted to 10.7% of all ordinary shares (22.2 million ordinary shares and 59.4 million American Depositary Receipts). The proportion of Volkswagen shares held by foreign institutional investors (including Brandes Investment Partners LLC) rose to 38.9% in the year under review (previous year: 34.1%).   German institutional investors held 7.4% (9.3%).

93.    In its 2005 Annual Report, VW reported the continued importance of U.S. investors in VW shares:

> As of December 31, 2005, the subscribed capital of Volkswagen AG comprised 321,929,800 ordinary shares and 105,238,280 preferred shares. As the largest single shareholder, Dr. Ing. h. c. F. Porsche Aktiengesellschaft held 18.5% of the voting shares at the balance sheet date. This corresponds to 14.0% of subscribed capital. The State of Lower Saxony held 18.1% of the ordinary shares or 13.6% of subscribed capital. As of December 31, 2005, Volkswagen AG held 41,719,353 ordinary treasury shares, corresponding to 13.0% of all ordinary shares or 9.8% of subscribed capital. A further tranche of shares is held by investment consultant Brandes Investment Partners, LCC [sic], San Diego, California, USA, which notified Volkswagen AG that the total proportion of ordinary shares held by its clients amounted to 8.58% of all ordinary shares on September 30, 2005. On October 11, 2005, investment management company The Capital Group Companies, Inc., Los Angeles, USA, held 3.504% of the voting capital of Volkswagen AG. The proportion of subscribed capital held by foreign institutional investors – including Brandes Investment Partners, LCC [sic] and The Capital Group Companies, Inc. – was 31.1% in total (previous year: 38.9%). German institutional investors held 7.0% (7.4%).

94.    In its 2006 Annual Report, VW reported:

> At the end of 2006, the subscribed capital of Volkswagen AG comprised 286,980,067 ordinary shares and 105,238,280 preferred shares. Dr. Ing. h.c. F. Porsche Aktiengesellschaft notified us that its share of voting rights in Volkswagen AG on November 13, 2006 was 27.40%, corresponding to 20.0% of subscribed capital. This means that Dr. Ing. h.c. F. Porsche Aktiengesellschaft is the largest single shareholder. The State of Lower Saxony held 20.26% of the ordinary shares on January 20, 2007, corresponding to 14.8% of subscribed capital. In 2006, the proportion of Volkswagen shares held by foreign institutional investors decreased to 23.9% (previous year: 31.1%). German institutional investors held 5.8% (7.0%).

95.    U.S. investors did not limit their purchases of VW shares to those that they executed on foreign exchanges.  VW also had (and still has) two sponsored ADR programs. Both of VW's ADR programs, representing ordinary and preference shares, are sponsored by