J.P. Morgan and trade in the U.S. on the over-the-counter ("OTC") market. Each ADR represents one-fifth of a VW share. Upon information and belief, most, if not all, of the ADRs were and are held by American investors.

### VENUE

96.     Venue is proper in this District pursuant to 28 U.S.C. §1391(d), because Porsche, Wiedeking and Haerter are aliens. Venue is also proper under 15 U.S.C. §78aa.

### DEFENDANTS' FRAUD AND MANIPULATION

#### A. Porsche's Early Acquisitions of VW Shares

97.     Porsche began acquiring VW shares in late September 2005. By September 28, 2005, Porsche had acquired a 10.26% voting stake in VW and expressed a desire to increase its ownership interest to 20%. Porsche's stated reason for acquiring VW shares was to lessen the possibility that VW would be subject to a hostile takeover which, Porsche claimed, could threaten business relationships between Porsche and VW.

98.     Discussions about a potential hostile takeover of VW were sparked by speculation that the European Court of Justice would soon invalidate a previous version of the VW Law that limited any one VW shareholder's voting rights to 20%, regardless of the number of shares held. The European Commission already had taken the position that the VW Law violated European Union law, and Porsche believed a hostile takeover attempt might follow invalidation. According to Porsche, its planned investment was "the strategic answer to this risk," but in no case, Porsche said, would its stake "reach the level at which Porsche would have to make a public offer to take over VW[,]" *i.e.,* 30% under applicable German law. Merrill Lynch advised Porsche on the acquisition of VW shares.

42

99.    Porsche continued with its acquisition of VW shares throughout 2005. On October 7, 2005, Porsche bought an additional 8.27% of VW shares from institutional investors and held 18.53% of the total. Porsche acquired shares from, among other investors, Brandes Investment Partners LLC in San Diego.

100.    Because many of VW's shareholders were United States residents, Porsche sought to address American investors' concerns about the motive behind its acquisitions. On October 12, 2005, Porsche employees, including Haerter, met with investors in New York at a meeting sponsored by Merrill Lynch to discuss Porsche's acquisition of VW's shares. The *Financial Times* reported that Porsche recognized "the market's skepticism" about Porsche's acquisition of the VW shares. In response, Porsche wanted to "meet UK and US investors to try to convince them of the merits of its plan."

101.    Throughout the next year, Porsche continually downplayed its acquisition of VW stock. On January 23, 2006, for example, Porsche's Manfred Ayasse stated: "We [Porsche] control 18.53 percent as well as an option for a further 3.4 percent[, but] there are currently no plans whatsoever of increasing the VW stake beyond this." On January 27, 2006, Haerter stressed that while Porsche intended to exercise its VW options at some indeterminate date, Porsche would not take its VW stake beyond the roughly 22% it would hold after exercise.

102.    On February 24, 2006, VW retired a portion of its outstanding shares. This action increased Porsche's stake to 21% of the total VW shares (or a 25% stake if it exercised options it held to buy additional shares). Then, on November 13, 2006, Porsche raised its stake from 21% to 27.3% of total VW shares by purchasing shares and exercising options.

103.    While continuing to increase its ownership interest in VW shares, Porsche announced on November 15, 2006, that it would raise its stake to just below 30%, the threshold at which German law would require it to launch a full tender for VW shares.

104.    Porsche continued its acquisition of VW shares in 2007. On, January 10, 2007, *Business Week* reported an interview between its Detroit correspondent David Kiley and Wiedeking that took place at the auto show in Detroit. During this interview, Wiedeking discredited the idea that Porsche was seeking to obtain control of VW. Kiley asked Wiedeking why Porsche was not paying a premium for control of VW. "Why should I pay a premium?" Wiedeking asked in response. "No. I don't see any reason for this; 29% is enough for Porsche. We won't acquire more than 50%."

105.    Porsche repeated the refrain on March 24, 2007, announcing that it planned to boost its stake to up to 31% but noting "[w]e don't want a majority." Porsche said the decision to cross 30% followed the February 13, 2007, recommendation by an adviser to Europe's high court that the judges should invalidate the VW Law. "We expect that law will be repealed entirely," the Porsche spokesman said.

106.    On March 25, 2007, Porsche increased its stake in VW again, moving to 31% from 27.3%. Porsche reported that the purchase was to prevent hedge funds from taking over and breaking up VW. "If hedge funds were to break up Volkswagen and publicly list [the company's individual brands] we would risk losing our most important partner. We cannot let such a breakup happen. That's why we acted," Wiedeking said. The very next day, March 26, Porsche exercised share options to raise its voting stake in VW to 30.9%. "We can now react even more quickly should hedge funds want to take a stake in VW," Wiedeking told a newspaper.

107.    By March 28, 2007, Porsche held 30.9% of VW's shares.  On account of the 30% ownership, German law required Porsche to submit a full tender bid on the remaining VW shares.  While Porsche made the mandatory bid, it did so at the lowest possible price—a price no rational investor would accept since it was below the then-prevailing market price—and publicly disclaimed any interest in taking over VW outright.

108.    Not surprisingly, VW's board determined that the mandatory offer was too low. VW's board announced that it could not recommend to shareholders that they accept Porsche's tender, as the fundamental valuation of VW shares was higher than Porsche's offer price.

109.    As of December 31, 2007, Porsche was VW's largest shareholder, with approximately 31% of VW's shares.  The State of Lower Saxony held 20.1%.  In the reporting period ending December 31, 2007, VW reported that the proportion of VW shares held by foreign institutional investors had increased to 25.6% (previous year: 23.9%).  German institutional investors held 6.2% (previous year: 5.8%).  On information and belief, a substantial portion of the shares held by foreign institutional investors was held to hedge Porsche's options on VW's shares.

### B. Porsche Misrepresents Its Actual Control over VW Shares to Keep the Acquisition Price as Low as Possible

110.    In an effort to ensure that its increasing stake in VW was hidden from view and to induce the Plaintiffs into short selling VW shares, Porsche made affirmative misrepresentations that it was neither purchasing nor intending to purchase a quantity of VW shares that could generate a squeeze.

*The False and Misleading Statements:*

<u>Porsche's statement on March 4, 2008, that once "antitrust clearance has been given, Porsche SE will acquire the majority shareholding in Volkswagen, with a view to creating one of the world's most innovative and efficient automotive alliances...."</u>

111.    In its half-yearly Financial Report from Stuttgart, Germany, March 4, 2008, which upon information and belief Dippell emailed into the United States, and that Porsche translated into English and published on its website, Porsche stated that once "antitrust clearance has been given, Porsche SE will acquire the majority shareholding in Volkswagen, with a view to creating one of the world's most innovative and efficient automotive alliances...."

112.    Porsche's statement was misleading.  Against the backdrop of Porsche's repeated public and private assurances that it did not intend to take over VW, the statement "Porsche SE will acquire the majority shareholding in Volkswagen" tells a reasonable investor that Porsche intended to increase to a share slightly more than the 50% required for clear majority voting.  In addition, the use of the word "alliances" suggests a cooperative working arrangement, not a situation in which one company takes over another, which is the case when a domination and profit transfer agreement is implemented.

113.    In fact, Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require *at least* 75% ownership.  Furthermore, as of March 4, 2008, Porsche had already entered into options contracts for many of the VW shares that it needed to achieve domination.

46

**Porsche's statement on March 10, 2008, that it would not raise its stake in VW to 75% and that the probability of obtaining 75% from the free float of VW shares was "extremely low"**

114.    In a corporate statement from Stuttgart, Germany, on March 10, 2008, which upon information and belief Porsche translated into English and Dippell emailed into the United States, Porsche denied that it would seek to raise its stake to 75% and said talk of such a move "does not consider the realities of VW's shareholder structure.... In view of the fact that the German Federal State of Lower Saxony, as the second major shareholder, holds a stake of more than 20% in [VW], the probability of acquiring the necessary shares from the free float is very small indeed.  The background of the current media reports is obviously provided by rumors on the Stock Exchange which can be traced back to the speculative mind games of analysts and investors."

115.    Porsche's statement that it would not raise its stake in VW to 75% was false.  In fact, Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership.

116.    Porsche's statement that "the probability of acquiring the necessary shares from the free float is very small" was false.  The probability of acquiring the requisite shares for domination from the free float was, for Porsche, extremely high due to its carefully orchestrated fraud and deception.  Porsche had already entered into options contracts for many of the VW shares it needed to achieve domination.  Porsche's counterparties had hedged those options by buying shares.  Porsche told analysts at the Frankfurt Auto Show in September 2007, more than

47

six months before its March 4, 2008, half-yearly report, that Porsche could take delivery in physical stock after it exercised its options.

117.    Porsche targeted short sellers to acquire control of the shares it desired.  As a practical matter, it would have been impossible for Porsche to acquire control of 75% without short sellers.  Short sellers could increase the supply of VW shares. Porsche induced the Plaintiffs to borrow VW shares and short them, undertaking an obligation to repurchase the shares and return them at a future date.  Porsche then bought call options from its counterparties, and Porsche's counterparties bought shares from Plaintiffs to hedge the call options they sold Porsche.  The VW shares hedging all of the call options that Porsche's counterparties sold to Porsche sat available for delivery to Porsche on exercise.  Put simply, Porsche targeted short sellers in order to amass a position in VW shares that it could not have amassed on the open market without the Plaintiffs' short selling.

Porsche's statement on May 5, 2008, that Porsche wanted to obtain more than 50% ownership in VW, that Porsche had locked up the ability to do so using options, and that it did not intend to increase its stake to 75%

118.    On May 5, 2008, Gaube told Keith Goodman of Glenhill that Porsche had no intention of increasing its stake in VW to 75%. Upon information and belief, Gaube knew Goodman was in New York at the time of the phone call.  On information and belief, Gaube was in Stuttgart, Germany when he made the statement.

119.    Porsche's statement was false.  Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership.  Furthermore, as early

48

as mid-2008, Porsche had achieved control over nearly 75% of VW shares through outright positions and options.

<u>Porsche's statement on May 29, 2008, about the extent of its planned increase in ownership of VW shares</u>

120.    On May 29, 2008, in a corporate statement from Stuttgart, Germany, Porsche announced that it would raise its stake in VW to more than 50% in 2008: "During the course of this year, [the] share will be increased to over 50%."

121.    Porsche's statement was misleading.  Against the backdrop of Porsche's repeated public and private assurances that it did not intend to take over VW, the statement "the share will be increased to over 50%" tells a reasonable investor that Porsche intended to increase its share to slightly more than the 50% required for clear majority voting.  In fact, Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership.  Furthermore, as early as mid-2008, Porsche had achieved control over nearly 75% of VW shares through outright positions and options.

<u>Porsche's statement on July 28, 2008, about the extent of its planned increase in ownership of VW shares</u>

122.    On July 28, 2008, Defendant Haerter told the German newspaper the *Frankfurter Allgemeine Zeitung*: "We're determined to cross the 51% threshold this year."  Reuters reported that Haerter told the paper that Porsche owns some 31% in VW, and has secured binding contracts over the purchase of another 5%.  Haerter said Porsche had already secured the

purchase price for additional VW shares through financial instruments.  On information and belief, Haerter was in Stuttgart, Germany when he made this statement.

123.    Porsche's statement was misleading.  Against the backdrop of Porsche's repeated public and private assurances that it did not intend to take over VW, referring to the "51% threshold" tells a reasonable investor that Porsche intended to increase to a share slightly more than the 50% required for clear majority voting.  In fact, Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership. Furthermore, as early as mid-2008, Porsche had achieved control over nearly 75% of VW shares through outright positions and options.

Porsche's statement on September 18, 2008, that a domination agreement was "totally unrealistic"

124.    On September 18, 2008, in a corporate statement that, upon information and belief, Porsche made from Stuttgart, Germany, Porsche told an online magazine that a domination agreement with VW was "totally unrealistic."

125.    Porsche's statement was false.  Porsche already had decided to seek domination of VW.  Ferdinand Piech, who resigned as a member of the Executive Committee of Porsche's Advisory Board because "vital information" about Porsche's options in VW shares was concealed from him, admitted in a May 2009 interview that even he knew of Porsche's plan to increase its stake in VW up to 75% as early as mid-year 2008.

126.    Porsche also had the ability to obtain sufficient shares to achieve domination. Porsche had entered into options contracts for virtually all of the VW shares it needed to achieve domination.  Porsche knew that its counterparties had hedged those options by buying shares. Porsche knew that the hedge shares were available from its counterparties whenever it chose to settle its options.  Porsche told analysts at the Frankfurt Auto Show in September 2007 that it could take delivery in physical stock when it exercised these types of options.

Porsche's statement on October 2, 2008, that domination was only a "theoretical option"

127.    On October 2, 2008, Defendant Wiedeking announced at the Paris Motor Show that Porsche planned to increase its stake in VW to more than 50% before the end of the year. As to domination, Wiedeking said, "We do not want to rule out this possibility at the end of the day, some point in the future," but for now, he continued, domination is a "purely theoretical option."

128.    Wiedeking's statement that Porsche planned to increase its stake in VW to more than 50% before the end of 2008 was misleading for the same reasons described above for nearly identical statements.  Wiedeking's statement that, as to domination, "We do not want to rule out this possibility at the end of the day, some point in the future" and his statement that domination was a "purely theoretical option" were false.  Porsche already had decided to seek domination of VW.

129.    Porsche also had the ability to obtain sufficient shares to achieve domination. Porsche had entered into options contracts for virtually all of the VW shares it needed to achieve domination.  Porsche knew that its counterparties had hedged those options by buying shares. Porsche knew that the hedge shares were available from its counterparties whenever it chose to

settle its options.  Porsche told analysts at the Frankfurt Auto Show in September 2007 that it

could take delivery in physical stock when it exercised these types of options.

> Porsche's statement on October 5, 2008, that 75% ownership was "out of the question at present"

130.    On October 5, 2008, Defendant Wiedeking told *Manager Magazine* online that

that a domination agreement was "a long term possibility…."  The 75%, he said, "is out of the

question at present."  Upon information and belief, Wiedeking was in Stuttgart, Germany when

he made these statements.

131.    Porsche's statement on October 5, 2008, that a domination agreement was "a long

term possibility" but that "[t]he 75 percent is out of the question at present" was false because

Porsche had the intention to take domination of VW in the very near future.

> Porsche's statement on October 20, 2008, that it did not intend to increase its stake to 75%, that it did not control almost all the float of VW shares, and disavowing the Max Warburton analysis as "complete bullshit"

132.    On October 20, 2008, Gaube told David Einhorn and Plaintiffs Greenlight

Capital, L.P., Greenlight Capital Qualified, L.P., Greenlight Capital Offshore Partners, and

Greenlight Reinsurance, Ltd. that Porsche was not going to 75%, that "going to 75% is not on the

agenda," and specifically denied controlling almost all of the float of VW shares.  Gaube also

expressly disavowed the speculation of one analyst, Max Warburton of Alliance Bernstein, who,

on October 17, 2008, had offered in the form of a Bernstein Research analyst report a seemingly

speculative argument that Porsche might be accumulating additional control of VW shares.

Gaube claimed to have "talked to a number of investors and analysts" to refute Warburton's

theory, which Gaube called "complete bullshit."  On information and belief, Gaube was in

Stuttgart, Germany when he made the statement.

52

133.    Porsche's statement was false.  Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership.  Furthermore, as early as mid-2008, Porsche had achieved control over nearly 75% of VW shares through outright positions and options, and this constituted control of almost all the float of VW shares.

134.    Porsche's statements also were false because Max Warburton's analysis had been correct: Porsche was accumulating control of additional VW shares.

**Porsche's statement on or about October 20, 2008, that it would stop accumulating shares above 50-55%**

135.    On or about October 20, 2008, Gaube told Neeraj Chandra and Plaintiffs Tiger Global, L.P.; Tiger Global II, L.P.; and Tiger Global, Ltd. that Porsche had options that would allow it to go take its stake in VW shares to 50-55%, but told Chandra that the accumulation would stop there.  Gaube told Chandra that Porsche had no intention of increasing its stake in VW to 75%.  On information and belief, Gaube was in Stuttgart, Germany when he made the statement.

136.    Porsche's statement was false. Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership.  Furthermore, as early as mid-2008, Porsche had achieved control over nearly 75% of VW shares through outright positions and options.

<u>Porsche's statement on October 22, 2008, that Porsche had no intention of increasing its
stake in VW to much beyond 51% of VW shares and did not intend to increase its stake
in VW to 75% of VW shares</u>

137.    On October 22, 2008, Gaube participated in a phone call with Glenview's Larry
Robbins.  Upon information and belief, Gaube knew that Robbins was in New York at the time
of the phone call.  On the call, Gaube told Robbins that Porsche had no intention of increasing its
stake in VW to much beyond 51% of VW shares and that it did not intend to increase its stake to
75% of VW shares.  On information and belief, Gaube was in Stuttgart, Germany when he made
the statement.

138.    Porsche's statement was false because Porsche had the intention to take
domination of VW in the very near future.

### C. The Materiality of Porsche's False and Misleading Statements

139.    Porsche's false and misleading statements were material to a reasonable investor.
No reasonable investor would have sold VW shares short (or, equivalently, entered into the short
side of security-based swaps) had it known of Porsche's plans to acquire 75% of VW, because—
combined with Porsche's control of VW shares through options—Porsche's purchases
guaranteed that short sellers would suffer a short squeeze in VW shares.

140.    Porsche's false and misleading statements were material to Plaintiffs.  Plaintiffs
are professional investors and at all times relevant here took into account statements that Porsche
made, privately and publicly, about its plans with respect to VW and its ownership of VW
shares.  Plaintiffs would not have sold VW shares short (or, equivalently, entered into the short
side of security-based swaps) had they known of Porsche's plans to acquire 75% of VW,
because—combined with Porsche's control of VW shares through options—Porsche's purchases
guaranteed that short sellers would suffer a short squeeze in VW shares.

**D. Porsche's Intention that Its False and Misleading Statements Would Deceive Market Participants Such as Plaintiffs**

141.    The following facts show that Defendants intended to deceive Plaintiffs and other investors about Porsche's intentions with respect to acquiring VW's shares:

a.  Porsche planned to take domination of VW at least as early as February 2008. Porsche representatives held a secret meeting in Berlin on February 25, 2008, with a high-ranking officer of the Government of the State of Lower Saxony participating on behalf of Prime Minister Christian Wulff.  As the German press first reported in May 2009, Porsche there stated its intention to implement a domination and profit transfer agreement, both of which require at least 75% ownership.

b.  Porsche had a plan to keep its takeover strategy secret.  Porsche's head of investor relations admitted on October 30, 2008, that Porsche took pains to keep its true strategy secret: "We are a very small company buying into a very big company. That is not something you can afford if everybody is able to read your strategy in the newspaper."  Gaube also admitted, as described above, that Porsche did not want to "put all eggs in one basket" because that made it "easier for us [i.e., Porsche] to not be visible, not be too visible in the market."

c.  VW's chairman, Ferdinand Piech, who was on Porsche's supervisory board before resigning, has admitted publicly that Porsche had decided to increase its stake up to 75% even when it was telling the market otherwise.  In an interview published on May 12, 2009, Piech revealed that as early as mid-year 2008, Porsche had decided to increase its stake in Volkswagen up to 75%.

55

### E. Porsche Executes the Short Squeeze

142.    With the price of VW shares falling, Porsche could no longer afford to wait. A further fall in the price of VW might bankrupt Porsche. Therefore, on October 26, 2008, after reaching agreement with VW's chairman Piech on the terms of Porsche's takeover of VW, Porsche revealed the truth to Plaintiffs and the public markets in order to set the short squeeze in motion to save its own skin.

143.    On that date, Porsche revealed for the first time that it already controlled almost 75% of VW shares. In an October 26, 2008 press release, which upon information and belief Gaube emailed into the United States, Porsche said: "At the end of last week, Porsche SE held 42.6 percent of the Volkswagen ordinary shares and in addition 31.5 percent in so called cash settled options relating to Volkswagen ordinary shares to hedge against price risks, representing a total of 74.1%."

144.    By referring to the cash settled options as "so called," Porsche communicated that those options entitled it to more than just cash upon exercise. Porsche underlined this point by adding the percentage of VW shares underlying its options to the percentage of VW shares it held outright. This was something Porsche had *never* done in any of its previous announcements. On September 16, for example, a Porsche press release had described the VW shares it owned outright as its "total stake." The sudden change in characterization, coupled with Porsche's use of the words "so called," signaled that Porsche believed it controlled the VW shares underlying its cash settled options, just as it controlled the VW shares it owned outright.

145.    Porsche's new and surprising message was received loud and clear by multiple press outlets on October 27, 2008, and October 28, 2008, including two of the most prestigious business publications in the United States:

Porsche Automobil Holding SE on Sunday said it had a near-75% stake in Volkswagen AG a much larger stake than the market expected, and said it wanted to tighten its grip on Volkswagen with a so-called domination agreement that would give it access to Volkswagen's cash flows.

Porsche announced it had control of 31.5% of Volkswagen through cash-settled options in addition to the 42.6% of shares it currently holds, leaving it just 0.9% short of the 75% level needed to log Volkswagen's revenues and assets in its own books.

Previously, Porsche's Volkswagen stake was known to be 35.14% plus an undisclosed number of options.

Christoph Rauwald, "Porsche Gains Nearly 75% of VW, Tightening Grip," B3,

*Wall Street Journal*, October 27, 2008.

The automakers jumped after Porsche reported Sunday its cash-settlement options equal almost a 32% ownership stake in the company, as well as a 43% stake in the company's common shares.

That increased Porsche's known holdings of its compatriot automaker to just below the 75% threshold needed for majority control under German law. Previous information showed Porsche holding a one-third share.

Alan R. Elliott, "Porsche Stake Boosts Ailing Automakers," B03, *Investor's Business Daily*,

October 28, 2008. (emphasis added)

Porsche said it had increased its effective holding of ordinary VW shares to 74.1 percent of the total. That is up from mid-September, when Porsche said its stake was 35.14 percent. VW is a heavily shorted stock, so when Porsche's announcement came out, implying that an already-small public float had shrunk further, the short bet immediately became riskier. That likely persuaded short-sellers to snap up VW shares to reduce or close their bets, leading to the rip-roaring rally.

Peter Eavis, "Porsche's New Spin on VW," Heard on the Street, C12, *Wall Street Journal*,

October 28, 2008.

146.    Porsche also went on to admit, contrary to Defendants' earlier statements, that it sought to acquire 75% of VW's shares and "dominate" VW.  "Assuming the economic framework conditions are suitable," Porsche said in the same October 26, 2008, press release, "the aim is to increase to 75% in 2009, paving the way to a domination agreement."  Far from being "totally unrealistic," as Porsche had claimed just weeks earlier, domination of VW was well within Porsche's grasp, as it had been when Porsche made its earlier false statements.

147.    At the time of Porsche's announcement of the true extent of its control of VW shares and its true intentions with respect to VW, the short interest in VW was about 13%. Porsche's acquisition of control over 74.1% of VW's shares, combined with Lower Saxony's well-known ownership of approximately 20%, meant that the free float available to short sellers to cover their positions was less than 5.9% of VW's shares, since some significant part of the 5.9% was held by index funds and other investors that could not and would not sell shares no matter what the price.  Porsche's corner meant that the short interest was more than twice the free float, virtually guaranteeing a short squeeze.

## CAUSES OF ACTION

### COUNT I
### (SECURITIES FRAUD BASED ON FALSE AND MISLEADING STATEMENTS IN VIOLATION OF §10(b) OF THE EXCHANGE ACT AND RULE 10b-5)
### Against All Defendants

148.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1–147 of this Complaint.

149.    Defendants carried out a plan, scheme and course of conduct which was intended to and did (i) deceive Plaintiffs and other investors, as alleged herein; and (ii) induce Plaintiffs and other investors to sell VW shares (or enter into the short side of security-based swaps) from

March 4, 2008, through October 24, 2008, and buy VW shares (or otherwise terminate short security-based swaps) at artificially high prices from October 27, 2008, through at least October 31, 2008.

150.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

151.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the buyers and sellers of VW's shares in violation of §10(b) of the Exchange Act and Rule 10b-5.

152.    All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

153.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal their true intentions with respect to acquiring 75% of VW's shares and the contracts they put in place to do so.

154.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs from March 4, 2008, through October 24, 2008, that Porsche had no intention of acquiring 75% of VW's shares, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make their statements about Porsche's intentions with respect to acquisition of VW's shares not misleading in light of the circumstances

under which they were made, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the sellers of VW's shares, including Plaintiffs, from March 4, 2008, through October 24, 2008.

155.  Defendants' false and misleading statements are alleged in ¶¶ 111-138 above.

156.  Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged herein.

157.  Defendants made their material misrepresentations and/or omissions knowingly and for the purpose and effect of concealing their true intentions with respect to the acquisition of VW's shares.

158.  The primary liability of Wiedeking and Haerter arises from the fact that each of them was a high-level executive at Porsche responsible for Porsche's acquisition of VW's shares, and each of them made statements to the public and contributed to or reviewed Porsche's press releases, as alleged in this Complaint, concerning Porsche's acquisition plans with respect to VW's shares. Each of them was aware of Porsche's dissemination of information to the investing public concerning Porsche's acquisition plans with respect to VW's shares that they knew to be materially false and misleading.

159.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, alleged above, the market price of VW shares was artificially depressed from March 4, 2008, through October 24, 2008, and artificially inflated from October 27, 2008, through at least October 31, 2008. Certain Plaintiffs suffered additional injury in covering short sales at artificially high prices prior to October 27, 2008.

160.  Defendants' misrepresentations and omissions caused Plaintiffs' losses. Defendants' fraud caused Plaintiffs' losses because Plaintiffs relied on the market for VW shares

being free of fraud when they entered into their short sales of VW shares. In ignorance of the fact that the market price of VW's shares was artificially depressed, and relying directly or indirectly on the false and misleading statements made by Defendants and described herein, or upon the integrity of the market in which VW's shares trade, and/or in the absence of material adverse information that was known to Defendants, but not disclosed in public statements by Defendants from March 4, 2008, through October 24, 2008, Plaintiffs sold VW shares (and entered the short side of security-based swaps on VW shares) at prices lower than would have existed had all of the facts been made public, and bought VW shares (or otherwise terminated short security-based swaps) at artificially high prices from October 27, 2008, through at least October 31, 2008.

161.    At the time of Defendants' misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true. Each Plaintiff constantly reviewed press reports on Porsche's investment in VW and considered press reports for their relevance to each of its investment decisions. Had Plaintiffs known the truth regarding Porsche's true intentions with respect to the acquisition of VW's shares, Plaintiffs would not have sold short VW's shares (or, what is economically equivalent, would not have entered the short side of security-based swaps on VW shares), or, if they had sold short VW's shares (or had entered the short side of security-based swaps on VW shares), they would not have done so at the prices which they accepted. Plaintiffs are professional investors and at all times relevant here took into account statements that Porsche made, privately and publicly, about its plans with respect to VW and its ownership of VW shares.

61

162.    The market for VW's shares was, at all times, an efficient market that promptly digested current information with respect to VW from publicly available sources and reflected such information in the prices of VW's shares and associated security-based swaps.

163.    VW's shares were traded on a number of markets, including Deutsche Bourse markets and in the United States through Volkswagen's sponsored ADR facility. VW shares were included in major market indices including the DAX.

164.    The market price of VW's shares reacted promptly to the dissemination of public information regarding VW.

165.    Security analysts followed VW and published research reports regarding VW that were publicly available to investors.

166.    The "fraud-on-the-market" theory applies. Plaintiffs justifiably relied on the integrity of the market price for VW's shares and were substantially damaged as a direct and proximate result of their sales of VW shares at artificially depressed prices and the subsequent increase in the price of VW shares when the truth was disclosed.

167.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5.

168.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective short sales of, and security-based swaps in, VW's shares from March 4, 2008, through October 24, 2008, and their purchases of VW shares (or other termination of short security-based swaps) at artificially high prices from October 27, 2008, through at least October 31, 2008.

## COUNT II
## (MARKET MANIPULATION IN VIOLATION OF §10(b) OF THE EXCHANGE ACT
## AND RULE 10b-5)
## Against All Defendants

169.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1–168 of this Complaint.

170.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in manipulative acts from March 4, 2008, through October 24, 2008, that kept the price of VW's shares lower than it would have been had all of the facts been made public, and then resulted in a short squeeze that drove the price of VW's shares to artificially high levels on and after October 27, 2008, through at least October 31, 2008.

171.    Defendants' market manipulation caused Plaintiffs' losses.    Defendants' manipulative acts caused Plaintiffs' losses because Plaintiffs relied on the market for VW shares being free of manipulation when they entered into their short sales of VW shares.    Defendants' market manipulation induced Plaintiffs to sell VW shares short, or enter into the economically equivalent short side of security-based swaps on VW shares, from March 4, 2008, through October 24, 2008, at prices lower than would have existed had all of the facts been made public. Defendants' market manipulation caused Plaintiffs to purchase VW shares or otherwise terminate their exposures to the short sides of security-based swaps on VW shares at artificially high prices on and after October 27, 2008, through at least October 31, 2008.

172.    At the time of Defendants' manipulation, Plaintiffs were ignorant of Defendants' manipulative acts. Had Plaintiffs known the truth regarding Porsche's true intentions with respect to the acquisition of VW's shares, or had Plaintiffs known that Defendants had hidden the extent of their control of additional VW shares through deceptive distribution of options

trades designed to evade counterparty disclosure laws, Plaintiffs would not have sold short VW's shares (or, what is economically equivalent, would not have entered the short side of security-based swaps on VW shares), or, if they had sold short VW's shares (or had entered the short side of security-based swaps on VW shares), they would not have done so at the prices which they accepted. Plaintiffs are professional investors and at all times relevant here took into account statements that Porsche made, privately and publicly, about its plans with respect to VW and its ownership of VW shares.

173.    The market for VW's shares was, at all times, an efficient market that promptly digested current information with respect to VW from publicly available sources and reflected such information in the prices of VW's shares and associated security-based swaps.

174.    VW's shares were traded on a number of markets, including Deutsche Bourse markets and in the United States through Volkswagen's sponsored ADR facility. VW shares were included in major market indices including the DAX.

175.    The market price of VW's shares reacted promptly to the dissemination of public information regarding VW.

176.    Security analysts followed VW and published research reports regarding VW that were publicly available to investors.

177.    As a result of the misconduct alleged herein, the market for VW's shares was artificially depressed from March 4, 2008, through October 24, 2008, and artificially inflated from October 27, 2008, through at least October 31, 2008. Certain Plaintiffs suffered additional injury in covering short sales at artificially high prices prior to October 27, 2008.

178.    The "fraud-on-the-market" theory applies. Plaintiffs justifiably relied on the integrity of the market price for VW's shares and were substantially damaged as a direct and

64

proximate result of their sales of VW shares at artificially depressed prices and the subsequent increase in the price of shares when the truth was disclosed.

179.    Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged herein, and intended to deceive Plaintiffs and hide the extent of Porsche's control of additional VW shares through deceptive distribution of options trades designed to evade counterparty disclosure laws.  Defendants engaged in their deceptive conduct knowingly and for the purpose and effect of concealing their true intentions with respect to the acquisition of VW's shares.

180.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5.

181.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective short sales of, and security-based swaps in, VW's shares from March 4, 2008, through October 24, 2008, and their purchases of VW shares (or other termination of short security-based swaps) at artificially high prices from October 27, 2008, through at least October 31, 2008.

## COUNT III
### (VIOLATIONS OF §20(a) OF THE EXCHANGE ACT)
#### Against All Defendants

182.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1–181 of this Complaint.

183.    Wiedeking and Haerter each acted as a controlling person of Porsche within the meaning of §20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of Porsche's acquisition plans with respect to VW shares, Wiedeking and Haerter each had the power to influence and control, directly or

indirectly, the decision-making of Porsche, including the content and dissemination of the press releases concerning Porsche's intentions with respect to the acquisition of VW's shares. Porsche controlled Wiedeking and Haerter and all of its other employees.

184.    As set forth above, Porsche, Wiedeking and Haerter each violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.    By virtue of their positions as controlling persons, Defendants are each liable pursuant to §20(a) of the Exchange Act.

185.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their sales of VW shares from March 4, 2008, through October 24, 2008, and in connection with their purchases of VW shares from October 27, 2008, through at least October 31, 2008.

**COUNT IV**
**(COMMON-LAW FRAUD)**
**Against Porsche**

186.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1–185 of this Complaint.

187.    Porsche made material misrepresentations and material omissions of fact which were false and which Porsche knew to be false.

188.    Porsche made material misrepresentations and material omissions of fact for the purpose of inducing Plaintiffs to rely upon them.

189.    Plaintiffs justifiably relied on the material misrepresentations and material omissions of fact.

190.    Plaintiffs were injured by their justifiable reliance on Porsche's material misrepresentations and material omissions of fact.

WHEREFORE, Plaintiffs each demand judgment against Defendants as follows:

(i)    on Count I for damages in an amount to be proven at trial;

(ii)   on Count II for damages in an amount to be proven at trial;

(iii)  on Count III for damages in an amount to be proven at trial;

(iv)   on Count IV for damages in an amount to be proven at trial; and

(v)    for such further relief as the Court may deem just and proper.

## REQUEST FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for each of the counts alleged.

DATED:    April 29, 2010              Respectfully submitted,


                                       Philip S. Beck
                                       Kaspar J. Stoffelmayr
                                       James B. Heaton, III, Ph.D.
                                       John D. Byars
                                       Ashley C. Keller
                                       Vincent S. J. Buccola
                                       BARTLIT BECK HERMAN
                                       PALENCHAR & SCOTT LLP
                                       54 West Hubbard Street, 3rd Floor
                                       Chicago, Illinois  60654
                                       Telephone:  (312) 494-4400
                                       Facsimile:  (312) 494-4440

                                       - and -

                                       KLEINBERG,  KAPLAN,  WOLFF  &
                                       COHEN, P.C.

                                       By:_____
                                       David Parker (DP-1075)
                                       551 Fifth Avenue, 18th Floor
                                       New York, New York  10176
                                       Telephone:  (212) 986-6000
                                       Facsimile:  (212) 986-8866

**CERTIFICATE OF SERVICE**

I, Marc R. Rosen, co-counsel for plaintiffs, hereby certify that on April 29, 2010, I caused

a copy of the Amended Complaint dated April 29, 2010, to be served upon Gandolfo V. DiBlasi,

Suhana S. Han, and Christopher J. Dunne, Sullivan & Cromwell, LLP, Attorneys for Defendant

Porsche Automobil Holding SE, 125 Broad Street, New York, New York 10004, by United

States first-class mail delivery.

Dated: April 29, 2010

_Marc Rosen_

Marc R. Rosen